# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-00089-COA

**FREDERICK A. PETTERSEN**                                        **APPELLANT**

**v.**

**AUDREY S. PETTERSEN**                                          **APPELLEE**

DATE OF JUDGMENT:               10/05/2016
TRIAL JUDGE:                    HON. MICHAEL L. FONDREN
COURT FROM WHICH APPEALED:      JACKSON COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:         G. CHARLES BORDIS IV
ATTORNEY FOR APPELLEE:          ROSS JONATHAN FRANCO
NATURE OF THE CASE:             CIVIL - DOMESTIC RELATIONS
DISPOSITION:                    AFFIRMED: 10/23/2018
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE GRIFFIS, P.J., BARNES AND GREENLEE, JJ.

### BARNES, J., FOR THE COURT:

¶1. The Jackson County Chancery Court granted Frederick and Audrey Pettersen an irreconcilable-differences divorce on March 10, 2016, and the parties agreed to let the court resolve any remaining issues concerning child custody and the equitable distribution of marital assets. After trial, the court entered its final judgment dividing the marital assets on October 5, 2016. Frederick appeals the court's finding, claiming the court erred in (1) failing to award him child support; (2) determining the date of demarcation; (3) its determination of the equitable division of the couples' retirement accounts; and (4) its classification of certain real property and other miscellaneous assets. Finding no abuse of discretion in the chancery court's findings, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.    Frederick and Audrey were married in Richmond, California, on January 23, 1990. At the time of the marriage, Frederick was fifty-two years old; Audrey was thirty-four. Both were chemical engineers employed by Chevron. Frederick retired in 1992, and the couple embarked on a seven-year sailing trip around the world. Three children were born of the marriage: (1) Sara was born in June 1990; (2) Luke was born April 1993; and (3) Ryan was born November 1995. In 2000, the couple bought a marital residence in Gautier, Mississippi. Frederick already owned several rental properties in Mobile, Alabama prior to the marriage.

¶3.    In March 2009, Audrey left the marital residence, moving out of state with another man. But in December 2010, she returned to Gautier and moved into a rental home she and Frederick owned located at 5101 Deerfield Avenue. Although Audrey never moved back to the marital residence, the parties made attempts at reconciliation throughout their separation, with the last attempt being in July 2014. Also during this period, Audrey returned to college to obtain a degree in education, and Frederick supported her, putting funds into a joint credit-card account for her use.

¶4.    Frederick filed for divorce on September 3, 2014, seeking a divorce on the grounds of habitual cruel and inhuman treatment and desertion. Audrey filed a counterclaim for divorce. On December 12, 2014, a temporary hearing was held, and a Family Master entered a fill-in-the-blank style temporary order, which simply denied Audrey's request for attorney's fees. It did not address any other issues. On February 13, 2015, the chancery court entered a temporary order stating that the parties were to have joint legal and physical custody of

their minor child, Ryan, and visitation was to be equally divided between the parties. Frederick was ordered to pay Audrey a one-time payment of $2,000, and then $2,500 per month until further order by the court.[1]

¶5. After a day of trial testimony, the parties entered into a written consent to divorce based on irreconcilable differences on March 10, 2016. They agreed that the issue to be decided by the chancery court was the equitable division of marital assets and liabilities. However, an amended consent to divorce on irreconcilable differences was later filed, adding the issues of alimony, attorney's fees, child support, and college expenses, as well as child custody.

¶6. On October 5, 2016, the chancery court entered its opinion and final judgment. Because Ryan was almost twenty-one years old, the court did not order child support. Employing the applicable factors from *Ferguson v. Ferguson*, 639 So. 2d 928 (Miss. 1994), the court analyzed and awarded marital assets as follows:[2]

(1)	Frederick was awarded the marital residence at 2025 Glen Cove (valued at $162,400) and ordered to pay Audrey $53,500 in equity. Audrey was awarded the property at 5101 Deerfield (valued at $55,400).[3]

(2)	Rental properties:

---

[1] The order does not indicate whether the monthly payments were for temporary spousal support or child support, but this distinction is not relevant to the appeal.

[2] For brevity's sake, we will only address the equitable division of those assets at issue on appeal.

[3] Audrey testified that she purchased the Deerfield home with money from an inheritance from her father's estate.

i.    675 Merritt Drive - Deemed a separate asset and awarded to Frederick.
ii.   670 Merritt Drive and 3757 San Juan Drive - Finding that Audrey contributed to the upkeep of these properties and performed bookkeeping services from before 1990 to 2011, the court concluded twenty-percent of the properties' value was marital; so Audrey received ten percent of the value—$6,860 and $5,770 respectively.
iii.  Patio Apartments: Although Frederick had purchased the Patio Apartments and almost paid off the note on the property prior to the marriage, the chancery court determined it was a marital asset as both parties had "contributed substantially" to the property, and its value ($513,758.50) was to be split evenly between the parties. Frederick was awarded ownership of the property (including rental proceeds) and ordered to pay Audrey $256,879.25.
iv.   3940 Bienville Boulevard - As the parties purchased the property during the marriage, it was deemed a marital asset and both parties awarded one-half of its value of $357,070. Fred was awarded ownership and ordered to pay Audrey her one-half interest of $178,535.

(3)   Retirement Accounts: The chancery court determined that the appreciation of the couple's retirement accounts during the marriage (Audrey - $112,427.75/Frederick - $810,020.48) constituted marital property and was subject to property division; therefore $922,448.23 was to be split equally between the parties. Audrey was to receive her entire retirement account to offset this amount, and Frederick was ordered to convey $348,796.36 to Audrey via a Qualified Domestic Relations Order.

(4)   Liabilities and Debts: The court found no marital liabilities or debts.

(5)   All requests for attorney's fees were denied, as both parties had "ample assets to pay for their respective attorneys."

Frederick filed a motion for reconsideration or to alter the judgment on October 17, requesting the chancery court to reconsider the division of property – specifically the retirement accounts, commercial property, and Patio Apartments. The chancery court denied

4

the motion on December 16, and Frederick appeals the court's decision.

## STANDARD OF REVIEW

¶7.     A chancellor's decision is reviewed by this Court for abuse of discretion. *Jenkins v.*

*Jenkins*, 60 So. 3d 198, 200 (¶6) (Miss. Ct. App. 2011) (citing *Mabus v. Mabus*, 890 So.2d

806, 810 (¶14) (Miss. 2003)).  "We will not disturb the chancellor's factual findings unless

the chancellor was manifestly wrong, clearly erroneous, or the chancellor applied an

improper legal standard." *Id*. at 200-01 (¶6).  Questions of law, however, are reviewed de

novo. *Id*. at 201 (¶6).

## DISCUSSION

### I.     Whether the chancellor erred by not considering child support.

¶8.     At the time of the March 2016 hearing, the couple's son, Ryan, was twenty years old

and, for the most part, lived several hours away at college.  The chancellor commented at the

hearing:  "It's going to be hard to tell a [twenty]-year-old where to put his head at night."

In the October 5, 2016 final judgment, the chancellor found:

> At the time of the trial, Ryan was a college student living away from home.
> He will be an adult in November of 2016.  Because he is turning twenty-one
> in about one month and he is off at college, this [c]ourt will not order child
> support.  Further, the child custody, visitation, and support issues were not
> presented to this [c]ourt to be decided.[4]  After Ryan obtains the age of
> majority this [c]ourt does not have the power to obligate either party to provide
> support for Ryan.

¶9.     Frederick argues that the chancellor should have ordered Audrey to pay child support

for Ryan during the duration of the divorce proceedings.  He also claims Audrey should have

---

[4] As the issues of child custody and support were briefly discussed at trial and noted
in the amended consent to divorce, the chancery court was incorrect in this regard.

been ordered to pay child support, including college expenses, for the year preceding the filing of his complaint. Mississippi Code Annotated section 93-11-65 (1)(d) (Rev. 2013) provides: "The noncustodial parent's liabilities for past education and necessary support and maintenance and other expenses *are limited* to a period of one (1) year next preceding the commencement of an action." (Emphasis added). This language is not mandatory, however. The chancery court still maintains discretion on whether to award the child support. Therefore, we find no merit to this claim.

¶10. As to his assertion that "[t]he lower [c]ourt's refusal to consider the issue of child support was detrimental to the best interest of the minor child," we note that although both parties presented these issues in their initial complaint/counterclaim, Frederick made no argument below regarding the chancery court's failure to address this issue in the temporary order. At trial, when asked if he wanted custody of Ryan, Frederick replied, "I'm willing to go joint custody. I don't have a problem with that." Frederick's attorney also remarked at trial that Ryan was "going to be an adult in November," and there was no real concern conveyed by the parties on this issue during the trial. It was actually the chancery court's decision to put the issue of child custody and support in the amended consent to divorce "just to be safe." The chancery court noted that neither parent "would let their children do without." Furthermore, this issue was not asserted in Frederick's motion for reconsideration.

¶11. Frederick claims that "by not considering the issues regarding custody and support (past and present), the [chancellor] denied [him] the opportunity to have his noneconomic and indirect contributions considered in the equitable distribution of assets." While we do

6

not question that Frederick unilaterally contributed to his children's education and support from marital assets after 2009, we find this claim is more pertinent to the court's equitable division of marital assets.

## II. Whether the chancery court erred in its determination of the date of demarcation.

¶12. The chancery court found that the date of demarcation was December 12, 2014, the date of the temporary hearing. The retirement accounts reflected a value date of December 13, 2014. Frederick argues that the date of demarcation should have been in either 2008 or 2009, when the couple separated.[5] Our Court has held:

> "The law in Mississippi is that the date on which assets cease to be marital and become separate assets—what we refer to as the point of demarcation—can be either the date of separation (at the earliest) or the date of divorce (at the latest)." *Collins v. Collins*, 112 So. 3d 428, 431-32 (¶9) (Miss. 2013). [However, a] chancellor may consider a temporary order as the line of demarcation between marital and separate property. *Id.* Ultimately, however, the chancellor has the discretion to draw the line of demarcation. *Id*. at (¶10).

*Randolph v. Randolph*, 199 So. 3d 1282, 1285 (¶9) (Miss. Ct. App. 2016).

¶13. We find no abuse of discretion in the court's determination that the date of demarcation was the date of the temporary hearing. As the court noted, although Audrey left the marriage in 2009, both parties testified that there were numerous attempts at reconciliation between 2009-2014. They also spent holidays together as a family over this

---

[5] Although the court also stated in its order that the line of demarcation was February 13, 2015, the date the temporary order was filed, we agree with Audrey that because the chancery court used the December 2014 date in valuing the IRAs and assets, the mention of February 2015 was likely a scrivener's error. Because Frederick's claim on appeal is not that the date should have been February 13, 2015, but that the court should have used the date of the separation, we find the distinction irrelevant.

7

period of time. Frederick sent Audrey a Valentine's Day card in 2010 and admitted that, in July 2013, the couple went to a hotel and had intimate relations. Audrey testified that the couple had sexual relations in July 2014, when she was over at the house for a barbeque. However, when she asked about moving back home, Frederick told her he was dating someone else. The couple had also filed joint tax returns during the separation, and Frederick acknowledged that he had voluntarily provided monetary support to Audrey during this period.

¶14. The date of demarcation—December 12, 2014—was only a few months after the couple's final attempt at reconciliation (June 2014) and the filing of the complaint for divorce (September 2014). Moreover, Frederick's counsel repeatedly referred to the date of the temporary hearing as the date of demarcation, and on cross-examination, when asked about some financial documents, Frederick made no objection to this date.

Q. And they're all for around the time of the temporary hearing.

A. Yeah.

Q. -- because we've agreed that that's the line of demarcation.

A. Okay.

Therefore, we find this issue without merit.

### III. Whether the chancery court erred in the classification and division of the parties' retirement accounts.

¶15. The chancery court determined that "the retirement funds accumulated during the course of the marriage [were] personal property subject to equitable division." With regard to Audrey's account, the Rule 8.05 financial declaration stated that on March 8, 2016, her

8

Chevron retirement account was valued at $238,530.29.[6] She testified that the balance at the time of marriage was $126,102.54; so the chancery court found "there was a $112,427.85 appreciation of Audrey's retirement account during the course of the marriage." In 2005, the couple invested all of her retirement into a money market account. The court found that on the date of demarcation, Frederick had $1,484,573.03 in his retirement accounts and "there was an appreciation of Fred's retirement of $810,020.48."

¶16. The chancery court determined that the parties had commingled their retirement accounts, noting Frederick had used retirement funds to pay for the children's expenses such as college tuition and travel. He also deposited his required minimum distributions into a money market account, M&M Holdings, which was the operating account for the Patio Apartments. Therefore, the chancery court found that Frederick's retirement became marital under the family-use doctrine and the appreciation of $810,020.48 was "marital property subject to property division." Although Frederick acknowledges that the couple met with financial advisors several times regarding their retirement accounts, he claims that the accounts were never commingled, which was evidence the couple never intended for the accounts to be considered marital property.

¶17. "[P]roperty division 'is committed to the discretion and conscience of the [c]ourt, having in mind all of the equities and other relevant facts and circumstances.'" *Carter v. Carter*, 98 So. 3d 1109, 1113 (¶11) (Miss. Ct. App. 2012) (quoting *Chamblee v. Chamblee*,

---

[6] The chancery court noted that no value from December 2014—the date of demarcation—was in the record, and the trial date was "the closest date to the point of demarcation."

637 So. 2d 850, 864 (Miss. 1994)). Frederick admits that he took out retirement funds from his IRA to pay for "family expenses such as education costs, groceries, etc." But he claims that the remainder of his retirement funds was nonmarital, citing *McKissack v. McKissack*, 45 So. 3d 716 (Miss. Ct. App. 2010). In *McKissack*, this Court held that only the portion of a certificate of deposit that had been designated for family use was marital; the remainder of the funds was a separate asset. We find *McKissack* distinguishable. During the trial, Frederick admitted to commingling his IRA disbursements into his personal accounts, including the M&M business account for the Patio Apartments, which was classified as a marital asset by the court.

> Q. All right. And the M&M small business account, which you just admitted the IRA finds its way into, that is the operating account for the Patio Apartments; true?
>
> A. *That is the operating account for my entire life.*
>
> . . . .
>
> Q. But I asked you yesterday if your IRA makes it into your Patio [Apartments] account, and you said, no, it doesn't, it goes into my savings account.
>
> A. It does. That's what that preferred rate account –
>
> Q. And then it goes into your Patio account; true?
>
> A. Later, yeah. In dribs and drabs, yeah.
>
> Q. And so when that IRA money finds its way into your M&M [Bank] small business account, which is the operating account for the Patio Apartments, it then goes into the Patio, and it goes into spending money on groceries, and it goes into spending money on the kids, and it goes all over the place; true?

A. Yeah. *It's money that I spend.* I told – I already said – I already testified that the money comes in from various sources, goes into the account, and I spend it as I – as I get bills. I pay my bills. That's what I do.

. . . .

And if I don't have enough money – income generated, if there isn't enough cash in that account from checks that come in, from rent checks or whatever, *then I have to draw money out of that* – and as you've noticed, the amounts that I've been withdrawing from the IRAs has been increasing substantially recently, as I pointed out earlier.

(Emphasis added).

¶18. Furthermore, when determining whether certain property is marital, a chancery court "must inquire whether any income or appreciation resulted from either spouse's active efforts during the marriage." *Rhodes v. Rhodes*, 52 So. 3d 430, 436 (¶20) (Miss. Ct. App. 2011). "If so, that income or appreciation becomes part of the marital estate." *Id*. Frederick testified that he had switched financial brokers and opened new accounts during the marriage. He also put retirement funds in stocks and other business dealings, such as an oil lease. As already noted, he and Audrey met with financial consultants on more than one occasion to discuss how best to manage the funds. On cross-examination, Audrey's counsel asked Frederick about his handling of the IRA monies:

Q. [D]o you remember telling me in your deposition that you had various experiments with your money, with the IRA funds, that you would tinker with this or try this to see if it would work; true?

A. Right.

Q. And you did TD Ameritrade. Do you remember how much you put into that program?

11

A. Well, I put $50,000 into the account. The program itself was, like, four.

. . . .

Q. And do you remember telling me in your deposition that you rolled a bunch of money into an Edward Jones IRA because you wanted someone local; true?

A. That's correct.

. . . .

Q. And so you took over $100,000 and put it into a local account because you wanted to have somebody who could advise you on your IRA that was in close geographic proximity.

A. *I wanted to see if I could find somebody that might make more money than Charles Schwab was making with the money.*

(Emphasis added). We find there was evidence that the appreciation of the accounts was due to active efforts by the couple to protect and increase their investments.

¶19. We also reject Frederick's claim that Audrey was not entitled to any of his retirement funds because of her extramarital affair. There was ample evidence that Frederick also had extramarital affairs with several women after the separation in 2009, while continuing his attempts to reconcile with Audrey. Their daughter testified in a deposition that Frederick had dated "quite a few" women. Moreover, a spouse's misconduct is only one factor to consider in the division of marital assets. A chancery court "should not view equitable distribution as a means to punish the offending spouse for marital misconduct. Rather, 'marital misconduct is a viable factor entitled to be given weight by the chancellor when the misconduct places a burden on the stability and harmony of the marital and family relationship.'" *Bond v. Bond*, 69 So. 3d 771, 773 (¶6) (Miss. Ct. App. 2011) (quoting

12

*Carrow v. Carrow*, 642 So. 2d 901, 904-05 (Miss. 1994)).

¶20.    Frederick argues that the chancery court failed to consider Audrey's Charles Schwab

IRA account no. 3106 and her Merrill Lynch IRA account no. 7729 in dividing the marital

assets, specifically Frederick's economic and noneconomic contributions to the acquisition

of those accounts.  He claims the "combined value of the two IRAs accumulated to more than

$78,000.00."  The record does not support Frederick's claim.  The chancery court took into

account both of Audrey's Charles Schwab accounts (Accounts 3104 and 3106), finding they

totaled $238,530.29, as evidenced by Audrey's Rule 8.05 financial declaration.  Further, her

Merrill Lynch account, which only had a listed balance of $13,498.79, was designated as an

"Inherited IRA" on Audrey's Rule 8.05 financial declaration; thus, we find no error in the

court's decision not to include it as a marital asset.[7]

¶21.    We find the chancellor's findings regarding the division of the couple's retirement

accounts was not an abuse of discretion.

**IV.    Whether the chancery court erred in its classification of certain real property.**

> *A.    670 Merritt Drive, Mobile, Alabama, and 3575 San Juan Drive, Mobile, Alabama*

¶22.    The chancery court found that although Frederick had acquired these Mobile rental

properties before marriage, Audrey had contributed to their upkeep and management.

Therefore, it concluded that twenty percent of the properties was marital, and Audrey should

receive one-half of the marital portion of the value of the properties, which was ten percent

---

[7] Frederick acknowledged at trial that Audrey had used funds from that account to purchase a vehicle.

13

($6,860 and $57,700, respectively).

¶23. "Marital property is 'any and all property acquired or accumulated during the marriage and is subject to an equitable distribution by the chancellor.'" *Mamiaro v. Mamiaro*, 179 So. 3d 51, 53 (¶7) (Miss. Ct. App. 2015) (quoting *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994)). There is no dispute that these properties were acquired before the marriage. But, in discussing *Ferguson*, the Mississippi Supreme Court held:

> Instead of looking to the bare title of a marital asset, this Court, as should the trial courts, will continue to consider all of the facts and circumstances surrounding the accumulation of the marital assets, including noneconomic contributions and factors, when deciding how the marital property should be divided under our system of equitable distribution.

*Carnathan v. Carnathan*, 722 So. 2d 1248, 1253 (Miss. 1998). Although Frederick argues that Audrey made no economic contribution to these properties, he acknowledges that Audrey helped prepare balance sheets with respect to the rental properties for a period of time during their marriage. We find, therefore, that the chancery court's awarding her ten percent of the properties' value was not an abuse of discretion.

### B.  *Patio Apartments*

¶24. Fred purchased the Patio Apartments thirteen years before he married Audrey, and had almost paid off the mortgage on the property. However, the chancery court determined that the Patio Apartments constituted a marital asset since Audrey had contributed over 17,000 hours of labor and restoration into the property and approximately $35,000 from an inheritance. The chancery court valued the property at $513,758.50 and awarded each party one-half of the value. As Fred was managing the property, he was awarded exclusive use

and possession and any rental proceeds, along with taxes and insurance. Audrey was awarded $256,879.25 to be paid within six months of the court's order.

¶25. Audrey testified that she had spent hours of physical labor to restore the property, working "ten hours a day, seven days a week" the year the couple moved to the Gulf Coast. There were also extensive renovations to the property after Hurricane Katrina. Audrey noted that the work on the apartments, and their disagreements on how it was to be managed, was a source of friction in the marriage. She had also contributed inheritance funds to the property's upkeep. When asked whether Audrey had contributed any interest in the property, Frederick replied: "Yes, she did." Frederick also admitted that the couple had "worked side by side cleaning up [the] apartments, repairing damage that had occurred." He stated during cross-examination that he had viewed the property as an asset that the couple shared, which would provide them future income.

¶26. "Commingled property is a combination of marital and non-marital property[,] which loses its status as non-marital property as a result." *Maslowski v. Maslowski*, 655 So. 2d 18, 20 (Miss. 1995). Audrey's significant noneconomic contributions and financial contribution from her nonmarital funds converted the property to a marital asset. Accordingly, we see no abuse of discretion in the chancery court's finding.

          *C.     3904 Bienville Boulevard, Ocean Springs, Mississippi*

¶27. The chancery court determined that commercial real estate located at 3904 Bienville Boulevard was acquired during the marriage and was marital property. While he awarded Frederick the property, along with the rental proceeds, he awarded Audrey one-half of the

15

marital interest totaling $178,535.

¶28. Frederick acknowledges that the property was bought in September 2007 when the couple was married and that the property was titled in both of their names. But he argues that the property is a "mixed asset," and the marital asset value should only be $82,070.08 (appraised value was $357,070.08) because he used nonmarital funds of $275,000 to satisfy the property's indebtedness and has managed the property since March 2009 without Audrey's assistance.

¶29. "[A] presumption of marital property arises to any property acquired during the marriage." *Maslowski*, 655 So. 2d at 20. The chancellor properly considered the applicable *Ferguson* factors, finding: (1) the property was acquired during the marriage; (2) Audrey had "substantially contributed to this property by serving as bookkeeper"; and (3) Frederick had managed the subject property during the separation and continues to do so. Therefore, we find no merit to this issue.

> **V.** **Whether the chancery court erred in failing to classify other miscellaneous assets.**

¶30. Frederick asserts that the chancery court erred in failing to classify Audrey's IRA accounts as marital, noting he had made economic and noneconomic contributions "in the acquisition of these IRA accounts." We have already addressed this issue and found no abuse of discretion in the court's findings regarding the couple's retirement accounts.

¶31. Frederick also contends the chancery court erroneously failed to consider the "joint debt" owed to Kilpatrick and Orr, the management company for the rental properties, in classifying the assets. Debts acquired during the course of a marriage are subject to equitable

16

distribution. *Carter*, 98 So. 3d at 1114 (¶15). However, Frederick was awarded sole ownership of the rental properties, which included rental proceeds. We, therefore, find no abuse of discretion in the chancery court's decision to order Frederick to be responsible for any management expenses associated with those properties.

¶32. Accordingly, we affirm the chancery court's judgment.

¶33. **AFFIRMED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., CARLTON, FAIR, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR. WILSON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**