# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI
## NO. 2018-CA-01767-COA

| | |
|---|---|
| **IN THE MATTER OF THE CONSERVATORSHIP OF MICHELLE A. GENO** | **APPELLANT/ CROSS-APPELLEE** |
| **v.** | |
| **CRAIG M. GENO** | **APPELLEE/ CROSS-APPELLANT** |

| | |
|---|---|
| DATE OF JUDGMENT: | 09/14/2018 |
| TRIAL JUDGE: | HON. J. LARRY BUFFINGTON |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | J. PEYTON RANDOLPH II |
| | ROBERT W. LONG |
| | RICK D. PATT |
| ATTORNEY FOR APPELLEE: | DAVID BRIDGES |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | ON DIRECT APPEAL:  AFFIRMED. |
| | ON CROSS-APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 03/30/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**BARNES, C.J., FOR THE COURT:**

¶1.     Craig and Michelle Geno were married on March 1, 2008.  During the marriage, the family's main source of income came from Craig's law practice.  Michelle stayed at home to care for the couple's two minor children, but she also had some success as the author of a two-book series published on Amazon.  Craig and Michelle separated on or about July 16, 2015, and two weeks later, Craig filed a complaint for divorce in the Madison County Chancery Court.  On June 17, 2016, the parties consented to a divorce on the ground of

irreconcilable differences. The chancery court entered an "Agreed Order" on August 23, 2016, which provided in relevant part that Craig was to pay for the transportation of Michelle's furniture from the current residence to her new residence and that he was to receive credit for those funds "from any final award to Michelle the [c]ourt may make." During the course of the proceedings, Michelle experienced mental health issues (bipolar disorder, ADHD, Cluster B personality disorders, hallucinations, and delusions), which required hospitalization; so the chancery court appointed Robert "Bobby" Long as conservator of Michelle's estate on January 23, 2017.

¶2. The trial on the remaining issues was conducted over eight days in 2017 and 2018. The court issued a bench ruling on September 4, 2018, and a written final judgment was entered on September 14, 2018. The chancery court awarded Craig sole legal and physical custody of the children. Michelle received supervised visitation but was not ordered to pay child support, as the court found she had no "present earnings capacity." The court determined that the "marital estate ha[d] a total value of $3.9 million, and that with the exception of Craig's law practice, the value of the marital estate should be divided equally between the parties." However, three assets were considered to be Craig's separate, non-marital property: (1) HG Realty LLC, a Mississippi limited liability company Craig formed in 2003; (2) a portion of a Vanguard account ($893,190.66, as well as passive earnings of $322,403); and (3) an ING/BankPlus account (valued at $298,808.03). Michelle was awarded permanent periodic alimony of $2,500 per month.

¶3. Michelle filed a motion to reconsider the judgment, particularly with regard to the

court's determination of non-marital property and alimony. Craig filed a motion to alter or amend the judgment, "respectfully urg[ing]" the court to increase its finding of $200,000 for Michelle's wasteful dissipation as assets for the following reasons:

> Michelle controlled, and then spent, without any explanation whatsoever, over $392,000.00 that she had taken from the parties' joint checking accounts during the course of the marriage, $64,000.00 for proceeds of book sales (while Craig paid the income taxes thereon); and over $56,000.00 in capital gains from stock sales of marital assets in 2015 and 2016. In addition, Michelle's premarital student loans of over $10,000.00 were paid, in full, during the course of the marriage, from Craig's earnings. The unexplained funds/waste value is over $512,000.00, yet Michelle was "awarded" less than one-half of funds she wasted and did not account for at all.

Craig also claimed "[t]he alimony award is over and above distributions that were balanced in the division of marital assets." The court entered an updated order on November 26, 2018, denying the relief requested by the parties. The court did clarify Michelle's equitable share of the marital assets and the method of transferring funds.

¶4. Michelle appeals, asserting that the chancery court erred (1) in its classification of certain assets as non-marital property; and (2) in its determination of the alimony award. Craig has filed a cross-appeal, also challenging the alimony award and additionally claiming that the chancery court (1) erred in its valuation of Craig's his law practice; and (2) failed properly to consider Michelle's dissipation of marital assets.

¶5. On direct appeal, we affirm, finding Michelle has not demonstrated that the court's findings on her assignments of error were not supported by substantial evidence. Regarding the issues raised by Craig on cross-appeal, we hold that the chancery court's findings concerning the valuation of Craig's law practice are supported by substantial evidence.

3

However, because the court failed to set forth specific findings as to the wasteful dissipation of assets by Michelle, we reverse and remand on this issue for further findings, which may require further consideration of the equitable distribution of assets and alimony. We also find the court erred by failing to include the amount Craig expended in transporting Michelle's furniture ($12,118.16) in the valuation and distribution of assets, in accordance with the chancery court's August 2016 order.

## STANDARD OF REVIEW

¶6.     "The scope of review in domestic cases is limited by the substantial evidence/manifest error rule. This Court will not disturb a chancellor's findings unless they were manifestly wrong or clearly erroneous, or the chancellor applied an erroneous legal standard." *Lee v. Lee*, 154 So. 3d 904, 906 (¶5) (Miss. Ct. App. 2014) (citations omitted).

## DISCUSSION

### Direct Appeal

### I.     Classification of Assets

¶7.     Michelle maintains that the chancery court erred in ruling that HG Realty LLC, portions of the Vanguard investment account, and the ING/BankPlus retirement account were non-marital property. Our review of a chancellor's decision is limited. *Fogarty v. Fogarty*, 922 So. 2d 836, 839 (¶11) (Miss. Ct. App. 2006). The distribution of property in a divorce will be affirmed if "it is supported by substantial credible evidence." *Bowen v. Bowen*, 982 So. 2d 385, 394 (¶32) (Miss. 2008). Additionally, "[e]quitable distribution does not [always] mean equal distribution." *Seymour v. Seymour*, 960 So. 2d 513, 519 (¶15) (Miss. Ct. App.

2006) (quoting *Lauro v. Lauro*, 924 So. 2d 584, 590 (¶23) (Miss. Ct. App. 2006)). The aim of equitable division is "a fair division of marital property based on the facts of each case." *Id*. (citing *Ferguson v. Ferguson*, 639 So. 2d 921, 929 (Miss. 1994)). Property division "is committed to the discretion and conscience of the [c]ourt, having in mind all of the equities and other relevant facts and circumstances." *Chamblee v. Chamblee*, 637 So. 2d 850, 864 (Miss. 1994) (quoting *Brown v. Brown*, 574 So. 2d 688, 691 (Miss. 1990)).

¶8.     Prior to determining equitable distribution, the chancery court should first classify the couple's assets as either marital or non-marital. *Boutwell v. Boutwell*, 829 So. 2d 1216, 1221 (¶19) (Miss. 2002). The Mississippi Supreme Court addressed the classification of marital property in *Hemsley v. Hemsley*, 639 So. 2d 909, 914 (Miss. 1994), holding that "[a]ssets acquired or accumulated during the course of a marriage are subject to equitable division unless it can be shown by proof that such assets are attributable to one of the parties' separate estates prior to the marriage or outside the marriage." As this Court has succinctly stated, only marital property of the parties is subject to equitable division. *Messer v. Messer*, 850 So. 2d 161, 167 (¶24) (Miss. Ct. App. 2003) (citing *Hemsley*, 639 So. 2d at 914).

        A.     *HG Realty LLC*

¶9.     In 2003, Craig created HG Realty LLC (HGR) as a means to own and lease the office building in which his law firm was housed. A lease was obtained by HGR, and the payments were covered through rent from the property's tenants, including Craig's law firm. In exchange for providing bookkeeping services to HGR, Craig's law firm received a discount of two months' rent each year. The chancery court determined that HGR was a separate,

5

non-marital asset. Michelle contends that HGR is a marital asset and subject to equitable distribution, noting the rental payments from Craig's law firm and bookkeeping services provided to HGR.

¶10. In *Spahn v. Spahn*, 959 So. 2d 8, 12 (¶10) (Miss. Ct. App. 2006), this Court concluded that where a husband (1) owned a warehouse prior to the marriage, (2) maintained a separate account into which he deposited rent, and (3) "did not commingle the proceeds from the warehouse, nor use the warehouse for family purposes," the property was properly classified as non-marital property. Similar to *Spahn*, HGR was Craig's separate property before the marriage, the rent was not paid to HGR from marital funds, and the building was not used for family purposes. Craig never received income from HGR. In addition, Michelle was neither involved in the management of HGR nor provided funds for its upkeep. Accordingly, we find the chancellor was correct in classifying HGR as non-marital property.

### B. Vanguard Account

¶11. Craig owned a Vanguard account containing $893,190.06 prior to the marriage. At the time of the parties' separation, the account had a balance of $3,352,855.33. The chancellor held that the original $893,190.06, as well as an additional $322,403 in passive income from interest and dividends earned after the marriage, were Craig's non-marital property. Michelle contends that the entire account should have been considered marital property because new funds were commingled with Craig's pre-existing funds, and funds from the account were used for the family to purchase marital property and pay household expenses.

6

¶12.    The family-use doctrine in Mississippi is generally applied in instances involving physical assets. *McKissack v. McKissack*, 45 So. 3d 716, 720 (¶22) (Miss. Ct. App. 2010). However, other "nonmarital assets may lose their status as such if the party commingles the asset with marital property or uses the assets for the benefit of the family." *Renfro v. Renfro*, 125 So. 3d 92, 97 (¶17) (Miss. Ct. App. 2010). "The supreme court defined commingled property as a 'combination of marital and non-marital property in which the non-marital property has lost its status as non-marital property by virtue of its being combined with the marital property.'" *Allgood v. Allgood*, 62 So. 3d 443, 448 (¶15) (Miss. Ct. App. 2011) (quoting *Boutwell*, 829 So. 2d at 1221 (¶20)). "[T]he key to determining when there has been transmutation by commingling is whether the marital interests can be identified, i.e., can be traced." *Brock v. Brock*, 906 So. 2d 879, 888 (¶50) (Miss. Ct. App. 2005).

¶13.    Testimony showed that the initial balance in the Vanguard account was entirely attributable to Craig, as he brought it into the marriage. Michelle was never added to this account; nor did she make any contributions. During the marriage, the balance of the account grew as Craig's earnings were deposited in it and investments were successful. We find the case cited by Michelle to support her claim, *Petterson v. Petterson*, 269 So. 3d 466 (Miss. Ct. App. 2018), distinguishable from the present case. In *Petterson*, the husband had commingled IRA disbursements into accounts that were deemed marital property by the court, and the Pettersons actively managed the account. *Id*. at 473-74 (¶¶17-18). Here, although Craig admittedly used funds from the account to pay some household expenses, and even gave Michelle money from the account, the record does not indicate that the account's

funds were commingled with other accounts found to be marital property. Neither Craig nor Michelle spent time "managing" the account—it was managed by an investment broker. Increases in the account's value during the marriage, as well as purchases for family use (i.e., the Oxford condominiums), were appropriately deemed to be marital property and subject to equitable distribution. Based on the testimony and evidence, the chancellor determined that because the interest on this amount could be traced, these portions of the Vanguard account were not commingled. We find the chancellor's decision to be supported by substantial evidence.

### C. ING/BankPlus Account

¶14. At trial, there was testimony that Craig's retirement account had increased from $298,808.03 at the time of the marriage to $572,364.88. No withdrawals were made from this account during the marriage. In his bench ruling and final judgment, the chancellor classified *only* $298,808.03 of this account as non-marital property. Michelle claims this finding was in error because Craig had contributed to the investment account "using various marital-related accounts and marital assets to grow the accumulation of the ING/BankPlus account."

¶15. "Marital property is 'any and all property acquired or accumulated during the marriage.'" *Pearson v. Pearson*, 761 So. 2d 157, 162 (¶15) (Miss. 2000) (quoting *Hemsley*, 639 So. 2d at 915). An asset that is determined to be separate property rather than marital property is not subject to equitable distribution. *Fitzgerald v. Fitzgerald*, 914 So. 2d 193, 197 (¶17) (Miss. Ct. App. 2005). We find the chancellor properly classified the amount that

Craig brought into the marriage as non-marital property and considered all additional funds that were added to the retirement account during the marriage to be marital funds subject to equitable distribution. As such, this Court can find nothing manifestly wrong or clearly erroneous in the chancellor's findings with regard to the ING/BankPlus account.

## II. Alimony

¶16. Based on his application of the *Armstrong* factors,[1] the chancellor awarded Michelle permanent periodic alimony of $2,500 per month. Both parties appeal this award. On direct appeal, Michelle argues that "[s]ince the purpose of alimony is to ideally allow the person to live in the manner to which she has become accustomed," this Court should reverse and "remand for a determination of the proper amount, or alternatively, for clarification of the [c]hancellor's ruling as to his findings of fact."

¶17. Only after the chancellor equitably divides the marital property and determines that one spouse has suffered a deficit should alimony be considered. *Lauro*, 847 So. 2d at 848 (¶13). The decision to award alimony and, if so, in what amount, is left to the chancellor's discretion. *Voda v. Voda*, 731 So. 2d 1152, 1154 (¶7) (Miss. 1999). Although Michelle claims that Craig has a separate estate valued at $1.5 million, she fails to point to any deficit she sustained that the chancellor did not take into account. In determining the alimony award, the chancellor specifically discussed Michelle's health and Craig's separate estate. He also awarded Michelle $1.25 million in cash, noting that she owned a house that was paid for (among other assets), and made specific findings as to her monthly household expenses.

---

[1] *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993).

¶18. To further support her demand for an increased alimony award, Michelle cites *Rogillio v. Rogillio*, 57 So. 3d 1246 (Miss. 2011), in which the supreme court held "that the husband is required to support his wife in the manner to which she has become accustomed, *to the extent of his ability to pay*." *Id*. at 1250 (¶11) (emphasis added). Because Michelle has not demonstrated that the award of alimony is inadequate, we find *Rogillio* does not support her argument. Moreover, the chancellor specifically found that Craig's earnings would not allow either Michelle or Craig to live in the manner to which they had been accustomed during the marriage, noting the "serious downward trend" in Craig's income.[2] *See Thompson v. Thompson*, 816 So. 2d 417, 420 (¶9) (Miss. Ct. App. 2002) (upholding chancellor's finding that the amount of periodic alimony requested was not feasible due to the husband's "greatly reduced earning potential" and that "neither party would be able to live as well separately" as they did together). We find Michelle has not demonstrated that the chancery court's decision not to award her larger amount of alimony was erroneous. We will address Craig's cross-appeal claims concerning alimony below.

## Cross-Appeal

### III. Valuation of Craig's Law Practice

¶19. In its ruling, the chancery court valued Craig's law firm at $772,000. While Craig retained his law practice, Michelle was awarded forty-percent (40%) of its value. In his initial brief, Craig claims that a mathematical error resulted in an overvaluation of his law practice by $33,405.81. In his cross-appellant's reply brief, Craig asserts that "[e]ven using

---

[2] The court also noted that Craig was nearing retirement age but "recognize[d] that that would be a change that he would be entitled to" if future modification is sought.

the [c]hancellor's math," the law practice was over-valued by $12,405.81, an amount Craig admits would be "de minimis" if it were the only error.

¶20.     The third *Ferguson* factor directs a chancery court to consider "[t]he market value . . . of the assets subject to distribution." *Ferguson*, 639 So. 2d at 928.  This Court has held that there are three ways in which a business's market value can be calculated for equitable distribution purposes:  "(1) an asset-based approach, in which assets and liabilities are evaluated, (2) a market-based approach, in which the market is surveyed for similar sales, or (3) an income-based approach, in which a value is placed on earning potential." *Lacoste v. Lacoste*, 197 So. 3d 897, 907 (¶34) (Miss. Ct. App. 2016).

¶21.     Although Craig values his practice at $471,116.44, the value calculated by Michelle Biegel, the person appointed by the chancery court to value his law practice, was $852,290.37.  Craig contends that the court erred in valuing his law practice at $772,000, noting Biegel's failure (1) to deduct the law firm's outstanding checks and (2) to list the accounts payable owed by the law firm as liabilities.  The record shows that the court did take these deficiencies into account when calculating the valuation of Craig's law practice.  Using Biegel's valuation of "852,000" as a "starting point," the chancery court stated at trial that it had "deducted the accounts payable and the outstanding checks" based on the testimony of Ken Lefoldt, a certified public accountant, and Lefoldt's opinion letter concerning the firm's valuation (Exhibit 64).  Lefoldt's letter opined that there were "outstanding checks of $98,775.79" and accounts payable totaling "$14,920.39" that Biegel did not take into account.  The court also added back $21,000 "that was paid to the lawyers" in its calculation.

11

As Craig recognized in his cross-appellant's reply brief, the "chancellor's math" resulted in an over-valuation of $12,405.81, which Craig concedes "might be considered a de minimis mistake" if not for "a far larger error."

¶22.　Craig's main point of error is that "Biegel's testimony could not be substantial evidence, because it was based solely on what [he] told her" about the firm's accounts receivable. Valuation "may be accomplished by adopting the values cited in the parties' 8.05 financial disclosures, in the testimony, or in other evidence." *Jenkins v. Jenkins*, 67 So. 3d 5, 13 (¶19) (Miss. Ct. App. 2011) (quoting *Horn v. Horn*, 909 So. 2d 1151, 1165 (¶49) (Miss. Ct. App. 2005)). But in some instances, "expert testimony may be essential to establish valuation sufficient to equitably divide property . . . ." *Redd v. Redd*, 774 So. 2d 492, 495 (¶9) (Miss. Ct. App. 2000) (quoting *Ferguson*, 639 So. 2d at 929). In this case, "[c]onflicting expert testimony—often called a 'battle of the experts' — require[d] the fact-finder to assign credibility." *Estate of Sykes ex rel. Campbell v. Calhoun Health Servs.*, 66 So. 3d 129, 135 (¶27) (Miss. 2011). The chancellor can accept or reject the opinion of any expert, and his finding is reviewed for abuse of discretion. *Canadian Nat'l/Ill. Cent. R.R. Co. v. Hall*, 953 So. 2d 1084, 1094 (¶29) (Miss. 2007). In addition to the parties' Rule 8.05 statements[3] and the expert reports, there was extensive testimony on this issue. Craig's experts, Lefoldt and Steve Rosenblatt, another bankruptcy attorney, presented testimony at trial, as did Biegel. As Craig acknowledges, the underlying data regarding the law firm's accounts receivables had been provided by Craig. Craig personally questioned Biegel, and he also testified

---

[3] UCCR 8.05.

regarding the valuation. Craig's own expert, Lefoldt, admitted that there was more than one way to calculate the net present value of a long-term receivable. Lefoldt also testified that he did not have "any major issue with [Biegel's] methodology."

¶23. Substantial, credible, and reasonable evidence is required to support a chancery court's factual findings. *Upchurch Plumbing Inc. v. Greenwood Utils. Comm'n*, 964 So. 2d 1100, 1107 (¶15) (Miss. 2007). However, "[o]ur courts have repeatedly recognized that the chancellor is entitled to make an independent judgment of a property's value, especially where the estimates of the parties vary widely." *Marter v. Marter*, 164 So. 3d 511, 514 (¶12) (Miss. Ct. App. 2015). This Court has also "affirmed a valuation where the chancellor had apparently just averaged the two proposed values, because the evidence in the record supported the conclusion that the low estimates were too low and the high estimates were too high." *Id.* at 514-15 (¶12) (citing *McKnight v. McKnight*, 951 So. 2d 594, 596 (¶¶7, 10) (Miss. Ct. App. 2007)). In *Dunaway v. Dunaway*, 749 So. 2d 1112 (Miss. Ct. App. 1999), this Court said:

> It is our conclusion that the chancellor, faced with proof from both parties that was something less than ideal, made valuation judgments that find some evidentiary support in the record. To the extent that the evidence on which the chancellor based his opinion was less informative than it could have been, we lay that at the feet of the litigants and not the chancellor.

*Id*. at 1121 (¶28). Although the chancery court's deduction of the outstanding checks and accounts payable may not have been precise, as in *Dunaway*, the chancery court in this case "fully explored the available proof and arrived at the best conclusions that he could . . . ." *Id.* Based on the evidence in the record, we find no manifest error with regard to the court's

valuation of Craig's law firm.

## IV. Wasteful Dissipation of Assets

¶24. When Michelle and Craig married, a joint account was established at Regions Bank. Michelle was not working at the time. Craig deposited money into the account from which Michelle paid the household bills. According to Craig, Michelle's total unaccounted transfers from the couple's checking account, "Etrade Waste & ATM Withdrawals" totaled $392,564, and he submitted evidence at trial that from June 2009 to November 2015, Michelle had transferred $274,300 from their joint Regions account to an HSBC online account solely in her name. Craig was unaware of these withdrawals until 2013. Additionally, Craig had to pay the taxes on $56,047 in accrued capital gains when Michelle liquidated the account. These amounts, in large part, form the basis of Craig's dissipation claim.

¶25. Craig submitted evidence at trial of alleged dissipation of assets by Michelle totaling $595,269.52, but the chancellor reduced Michelle's part of the marital estate by only $200,000 with no findings on the record as to why the remaining $395,269.52 was not also attributed to Michelle. Arguing the chancellor erred in its calculation, Craig asserts that the money Michele secreted from their banking account into a separate account "was wasted," as well as $64,000 in proceeds from her book and the $56,047 that he had to pay in capital gains taxes because she had liquidated investment accounts. Michelle does not dispute the finding of dissipation and notes that the chancellor heard the testimony, agreed with some of Craig's claims, and reduced her portion of the marital estate by $200,000. *See id.* at 1119

14

(¶19) (holding that a chancellor erred in awarding a wife 100% of the assets dissipated by her husband and that 50% was a more appropriate award).

¶26.    Michelle testified that the funds she moved out of their joint account was "marital money" that she was putting into savings.  Craig disputed this testimony, saying the HSBC account was in her name only.[4]  Although she claimed Craig knew about the other account, he testified that it was not until she was committed to psychiatric treatment in 2013 that he learned she had been withdrawing money to put in that account.[5]

¶27.    In addition, Craig claims that shortly before he filed for divorce, Michele began "out-of-control spending," which lasted throughout their separation.  This assertion is supported by testimony and evidence that from July 2015 to January 2016, Michelle incurred $82,658.52 in charges to her American Express card.  During this time, Craig was paying for all of Michelle's expenses other than her clothes.  The American Express bills showed charges for dozens of DVDs of the same movie, hundreds of dollars for perfume, thirty-two pairs of tennis shoes for the Genos' two children purchased in the same month, and seventy or eighty baseball caps, among other similar purchases.  Craig also factors into his dissipation claim:

    1.    His payment of $10,554.64 for Michelle's student loans from the joint Regions account;

---

[4] Craig acknowledged that his name was listed on the HSBC account but claimed he never had signatory authority or "authorized [his] name to be placed on there."

[5] The couple's joint tax returns for 2008-2011 reflect interest from an HSBC account; so presumably it is either a different account, or Craig did not question the source of the funds.

2. Michelle's earnings from the sale of her novels on Amazon in the amount of $64,000 which were never accounted for, but for which Craig paid the taxes; and

3. The chancellor's failure to credit $12,118.16 to Craig for the funds expended by him in having Michelle's personal property moved from Oregon to Mississippi.

Craig claims that the chancellor committed reversible error in failing to explain why these remaining alleged dissipated assets were not included in its valuation.

¶28. In calculating the equitable division of marital assets, the chancery court must consider "[t]he degree to which each spouse has expended, withdrawn[,] or otherwise disposed of marital assets[.]" *Lowrey v. Lowrey*, 25 So. 3d 274, 286 (¶28) (Miss. 2009) (quoting *Ferguson*, 639 So. 2d at 928). Here, the chancellor simply stated in his bench opinion:

> I am taking from [the marital assets] – because there was enough testimony to me of squandered property that [Michelle] did, basically, after the separation prior to the – to the drop-dead date, as I like to say, even though it was paid there, it's – so I've taken $200,000 off for what I consider money that just went wherever, I don't have any idea.

"[I]n applying the [*Ferguson*] factors, 'chancellors must support their decisions with findings of fact and conclusions of law.'" *Foreman v. Foreman*, 223 So. 3d 178, 183 (¶13) (Miss. Ct. App. 2017) (quoting *Dickerson v. Dickerson*, 34 So. 3d 637, 644 (¶24) (Miss. Ct. App. 2010)). Although the court credited $200,000 for the dissipation of assets, there were no specific findings on the record as to why the remaining $395,269.52 requested by Craig was not also attributed to Michelle. In the absence of specific findings, this Court has no way of knowing how the court arrived at that figure. In *Lowrey*, the supreme court held:

16

> Our rules provide parties the right to request chancellors to make specific findings of fact and conclusions of law. Factor tests, such as provided in *Ferguson* for property division and *Armstrong* for alimony, must be considered on the record in every case. *See Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994); *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993). These factor considerations are not only essential for appellate purposes, but also for trial courts, as they provide a checklist to assist in the accuracy of their rulings.

*Lowrey*, 25 So. 3d at 280 (¶7). Specifically, the *Lowrey* court found that the chancery court erred, as its judgment failed "to calculate the correct amount of wasteful dissipation," among other factors. *Id*. at 286 (¶29). Further, the supreme court noted that while the court "did make a finding of fact regarding the disposal of assets," the "substantial evidence [did] not support the totality of the wasteful dissipation." *Id*. at 288 (¶32). Although there was no fault found in the chancery court's determination that the wife had "dissipated assets due to her gambling addiction," it was concluded that "the amount of wasteful dissipation charged to [her] in the findings of fact, $122,000, significantly understate[d] the amount dissipated and the timing of the waste." *Id*. at 288-89 (¶34).

¶29. Similarly, the court in this case arrived at a random amount of dissipated assets, with seemingly no regard to the credible evidence that Craig produced as to Michelle's siphoning of funds from their marital account and her undisputed excessive spending during the couple's separation. While Craig may not be entitled to credit for the entire $595,269.52 he requested, the chancery court should have addressed the allegations of Michelle's dissipation of assets with greater specificity. Therefore, we reverse and remand for detailed findings of fact on this issue.

¶30. Furthermore, because the court's August 2016 order ruled that Craig was to "receive

17

credit for the funds advanced for the transportation" of Michelle's furniture, we find the chancery court erred in failing to include that amount ($12,118.16) in the valuation and distribution of assets.

## V. Alimony

¶31. Craig cross-appeals the alimony award, arguing it was too high based on the severe reduction of his income over the last several years, the dissipation of assets by Michelle, the fact that Michelle sustained no deficit after the distribution of assets, and the fact that parties were only married for seven years. Although Craig contends Michelle "was to some extent capable of providing for herself," we find the chancellor's determination that Michelle's "illness," which will require treatment and "limit her ability to have gainful employment," is supported by the substantial evidence presented concerning her ongoing medical/mental issues.

¶32. Craig also contends that the court erroneously determined that seven years is a long marriage. We find no merit to Craig's argument. One *Armstrong* factor to be considered is the "length of the marriage." *Id*. at 292 (¶44). Whether seven years constitutes a long marriage may be questionable to some people. However, in *Parsons v. Parsons*, 678 So. 2d 701, 705 (Miss.1996), the supreme court determined that an award of periodic alimony was appropriate in a marriage that lasted less than four years, as the wife had "significant monthly expenses, but absolutely no income, thus, no means of paying these expenses." Likewise, the chancery court here considered, among other factors, Michelle's illness, treatment requirements, and her inability to earn enough to support herself in the manner she had

18

become accustomed to during the marriage.

¶33.    Lastly, although Craig acknowledges that the chancery court determined on the record that Michelle "had actually wasted $200,000 in the marital assets," he claims that because the chancery court "only gave passing consideration" to Michelle's wasteful dissipation of marital assets in awarding alimony, that factor "had no discernable effect on [the court's] decision." Craig argues that he should not "be required to pay permanent alimony to his [thirty-eight] year old ex-wife – especially after she inflicted such grievous injury on the family's finances."

¶34.    As discussed, we have found the chancery court's failure to make specific findings on the record as to Michelle's wasteful dissipation of assets warrants a remand for further findings. One of the factors to be considered in determining an alimony award is the "[w]asteful dissipation of assets by either party." *Armstrong*, 618 So. 2d at 1280. Therefore, in making additional findings on this factor, the chancery court will need to consider whether those findings affect the alimony award. Moreover, the supreme court has held, "Alimony and distribution of assets are distinct, but interrelated, concepts, and where one expands, the other must recede." *Rogillio*, 57 So. 3d at 1251 (¶16). *See also Lauro*, 924 So. 2d at 588 (¶11) ("[P]eriodic alimony can only be awarded after the proper equitable distribution of marital assets is complete[,] and when equitable distribution is revisited[,] periodic alimony must also be revisited."). We make no ruling as to whether the court must expand the alimony award in light of any change in the distribution of assets, particularly as any decrease in distribution to Michelle would be attributable to her dissipation of assets. However, the

19

chancellor must be free to revisit the final award of periodic alimony in light of any change in distribution of assets.

## CONCLUSION

¶35. We affirm the court's findings with regard to the issues raised on direct appeal, as Michelle has not shown that the chancery court's findings were not supported by substantial evidence or constituted manifest error. On cross-appeal, we hold that the court's determination regarding the valuation of Craig's law practice is supported by substantial evidence. However, regarding the issue of wasteful dissipation of assets, we reverse and remand for the court to make more detailed findings as to its calculation of this amount, which may affect distribution of both marital assets and alimony. We further find that on remand, the chancery court should provide Craig with credit for the funds he expended in transporting Michelle's furniture, in compliance with the August 2016 "Agreed Order."

¶36. **ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**WILSON, P.J., LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. GREENLEE AND McDONALD, JJ., CONCUR IN PART AND DISSENT IN PART WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, P.J., AND McDONALD, J.; GREENLEE, J., JOINS IN PART.**

**WESTBROOKS, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶37. The majority finds that the trial court failed to make specific findings regarding Craig's claim of wasteful dissipation. While this is true, I am of the opinion that the chancellor gave sufficient consideration to Michelle's expenditures before designating an

20

amount for wasteful dissipation. Therefore, I respectfully dissent in part.

¶38. Although Mississippi has no specific test for discerning the dissipation of marital assets, the issue has been addressed by this Court. *See Smith v. Smith*, 90 So. 3d 1259, 1268-69 (¶37) (Miss. Ct. App. 2011) (stating that although there is no specific test, the dissipation must be "wasteful"). The majority opinion posits that Michelle's dissipation of marital assets should have been more thoroughly discussed on the record based on the factors set forth in *Ferguson*. While *Ferguson* does indicate that a chancellor should take into account when a "spouse has expended, withdrawn or otherwise disposed of marital assets[,]" the case does not indicate any specific factors that should be taken into account when making a determination as to dissipation. *Ferguson*, 639 So. 2d at 928.

¶39. We have previously held that factors to be considered when a dissipation claim is at issue should be:

1. whether the expenditure benefitted the marriage . . . ;

2. the timing of the transaction [(i.e., did it occur at or near the time of separation)];

3. whether the expenditure[s] [were] excessive or de minimis; and

4. whether the dissipating party intended to hide, deplete, or divert the marital assets.

*Smith*, 90 So. 3d at 1268-69 (¶37) (quoting *Thompson v. Thompson*, 811 N.E.2d 888, 915 (Ind. Ct. App. 2004)). The chancellor did not specifically discuss these factors on the record, but because no formal test has been adopted by the Supreme Court, he was not required to do so. *Id*. Despite the fact that the factors set out in *Smith* have yet to be adopted, the record

21

is clear that Michelle's spending did not benefit the marriage, occurred in large part around the date of separation, was excessive, and hid or diverted assets. Notably, Michelle does not dispute the finding of dissipation and notes that the chancellor heard the testimony, agreed with some of Craig's claims, and reduced her portion of the marital estate by $200,000. The chancellor stated that his decision finding that Michelle "squandered property" after the separation was based on the parties' trial testimony.

¶40. The chancellor cannot be found to have abused his discretion in this instance because there was no statute or caselaw obligating him to make additional findings regarding Michelle's dissipation of marital assets. I believe there is substantial evidence in the record to support the chancellor's decision regarding dissipation. Craig's argument that he should have received credit for the entire $595,269.52 is incorrect.

¶41. For the foregoing reasons, I respectfully dissent from the majority opinion regarding wasteful dissipation of assets.

**CARLTON, P.J., AND McDONALD, J., JOIN THIS OPINION. GREENLEE, J., JOINS THIS OPINION IN PART.**