Jane Dean GRECO, Plaintiff-Respondent,

v.

Joseph Thomas GRECO, Defendant-Appellant.

No. 30668.

St. Louis Court of Appeals.

Missouri.

April 17, 1962.

Lashly & Neun, Paul W. Lashly, St. Louis, Spradling & Bradshaw, Albert M. Spradling, Jr., Cape Girardeau, for appellant.

Thompson, Mitchell, Douglas & Neill, James M. Douglas, Richard P. Conerly, Harold I. Elbert, St. Louis, for respondent.

DOERNER, Commissioner.

Plaintiff brought this action for divorce, alleging certain indignities. Defendant answered, denying the charges made, but sought no cross relief. Upon the conclusion of the trial the court entered a decree awarding plaintiff a divorce, the custody of the minor child of the parties (subject to certain rights of visitation and temporary custody granted defendant), and an allowance of $25.00 per week for the support of the child. Defendant prosecutes this appeal from that judgment.

In her petition the plaintiff alleged, as grounds for her action, that defendant was constantly of a nagging disposition, finding fault with and criticizing plaintiff and plaintiff's minor children by a former marriage, all without just cause or reason; that defendant was possessed of a violent temper causing him upon occasions

to engage in heated arguments and quarrels; that defendant was cool and indifferent toward plaintiff and on numerous occasions stated that the only one that meant anything to him was Mary Jane, the baby born of the marriage; and that defendant had been critical, fault-finding, and unreasonably harsh in his treatment of plaintiff's minor children by a former marriage, causing plaintiff to be in a constant turmoil.

The parties first met late in 1955 at Barnes Hospital in St. Louis, where defendant was an Associate Director and plaintiff was a volunteer worker. They were married in St. Louis County on January 1, 1956, and separated on March 21, 1958. In the interim a daughter, Mary Jane, was born on May 26, 1957. Both plaintiff and defendant had previously been married and divorced, and each had two children by his prior marriage. Plaintiff's children, who resided with the parties, were Roy, nicknamed Butch, and James, who at the time of the marriage were 9 and 5 years of age, respectively. Defendant's children lived with their mother, but on infrequent occasions visited in the home of the parties.

The action was vigorously contested, the record is lengthy, and in most areas there is a sharp conflict in the evidence. Plaintiff testified that prior to the marriage she told defendant that she had had quite a lot of trouble with Butch since he was 3 or 4 years old, and that two different psychiatrists to whom she had taken him had advised her that Butch needed special handling, and a lot of affection and love. In these premarital discussions, plaintiff said, she informed defendant that when Jimmy was 11 months old he was burned badly and was in a hospital for 5 months, during which time plaintiff spent practically all of her time with him; that that was the principal reason Butch developed a feeling of rejection; and that that was why Butch needed a loving, attentive, understanding and patient father. Defend-

ant testified that plaintiff asked him to help her rear Butch correctly, and discipline him, and that he agreed to do so, but denied that the subject of his being a good father to the boys ever came up in the discussions.

Plaintiff testified that during the period of courtship, which was from November to January, and for the first three or four months after the marriage the defendant took Butch and Jimmy on wiener roasts, to picture shows, and out for hamburgers, and that his relationship with the children was very, very wonderful, but that about two to four months after the marriage defendant's attitude changed, his efforts towards companionship ceased, and he imposed a regime of strict discipline on the boys, particularly Butch. The substance of plaintiff's testimony was that defendant exhibited a lack of patience and tolerance, and that for minor transgressions defendant punished the boys severely, particularly Butch. Plaintiff testified that during the time the parties lived together defendant whipped Butch about 25 or 30 times with a belt or switch, first requiring Butch to strip from the waist down, and bend over and hold his ankles. Defendant testified that he had whipped Butch only 3 or 4 times, when Butch showed a complete lack of respect for his mother, that he used a little hedge switch tapering from a quarter to a sixteenth of an inch thick, but that he couldn't recall ever switching him with his trousers down. Plaintiff testified that on one occasion defendant was about to whip Butch and make him strip when Marlena, defendant's daughter by his first marriage, was in the room, but plaintiff insisted that Marlena leave the room. Defendant testified that he didn't remember such an incident.

Plaintiff testified that defendant once "campused" or confined Butch to the small backyard for two weeks, and when Butch stepped out of the yard to retrieve a ball defendant extended the restraint for an additional week. Plaintiff also testified the campusing was a customary form of

punishment. Defendant testified he couldn't recall the practice of campusing on his part, and that the one time when he campused Butch, for a week, Butch had deliberately thrown the dog into the wading pool, which defendant had cleaned, in violation of defendant's instructions. Defendant testified he didn't recall any incident when he insisted Butch remain in the yard another week because he had stepped out of the yard to get a ball. Plaintiff testified that other forms of punishment administered by defendant, particularly to Butch, consisted of restricting him to his room, depriving him of meals, refusing him permission to make his customary Friday night visit to his grandparents, and requiring Butch and Jimmy to remove ash trays and other objects of their handicraft from the parties' bedroom to the recreation room in the basement. Defendant testified that he had never used any means of punishing Butch which plaintiff hadn't used, and denied that he had refused to let the boys visit their grandparents or required them to remove their knicknacks to the basement. Plaintiff testified that defendant used the phrase " 'When I say frog, you hop.' " (presumably to indicate the degree of obedience he expected). Defendant conceded that he used the phrase, but said that he did so in a joking manner, and that plaintiff and her mother, Mrs. Pott, did likewise.

As a further instance of defendant's treatment of Butch, plaintiff related that in September 1957, she and defendant went to a parent-child picnic at Community School, a private school, which Butch and Jimmy attended. Defendant told plaintiff not to ask him to sit at Butch's table, for the sixth grade, because Butch was too mean, and defendant sat with Jimmy at the table for the second grade. During the evening Butch went to the shop and got a tool box he had made for defendant on which the word "daddy" was inscribed in big red letters. He brought it to the table where defendant was sitting and said, " 'Daddy, here is the tool box I made

for you.' " In the presence of the others at the table defendant replied, " 'I don't want that thing.' " Butch burst into tears, and in plaintiff's words " * * * we tried our best to get away from there as fast as we could." Defendant admitted that he had refused to accept the tool box from Butch, in the presence of others. He testified that about three weeks before the incident he and plaintiff were having a considerable amount of trouble with Butch, and that when Butch announced one morning that he was going to make defendant a tool box defendant asked him not to because he didn't want one; that Butch informed defendant he was going to make it whether defendant wanted it or not; and that defendant told Butch that if he had to make one to make it for his grandfather. Defendant said that he apologized to plaintiff for his act, and told her he had made a mistake and was sorry for the manner in which he had handled Butch at that particular time. Defendant said that he also apologized to Butch but that the incident represented the turning point in his relations with the boy, because from that time on, which was September 1957, he had no further trouble with Butch.

Plaintiff testified that she objected to defendant's discipline, telling him that it was too strict and unjust, that the children would hate him, and that he should be more patient, understanding and tolerant. She said that defendant told her that he was the head of the house, that he was going to do the disciplining, that she was not to open her mouth and that if she did he would wash himself completely of both boys and not have a thing to do with them. Defendant testified that until after January 1958, plaintiff never admonished him for disciplining the children; said he never remembered telling her to keep her mouth shut about the way he was disciplining them; and testified that after January 1958, he may have said that if plaintiff objected to his method of disciplining he would wash his hands of the whole affair but that he didn't recall hav-

ing made such a statement before that time, although he might have.

Plaintiff testified that when defendant's children by his first marriage, Tommy and Marlena, visited their home defendant took all four children out, usually every day, but that after Tommy and Marlena left then nobody went any place any more. Plaintiff said that defendant permitted Tommy to run the power mower and allowed Marlena to hold the baby, Mary Jane, but that he would not permit Butch to operate the power mower nor would he permit Butch or Jimmy to hold the baby. Defendant testified that Tommy was one year older and larger than Butch, and that he did not want Butch to use the power mower alone because he felt it was dangerous. Plaintiff said Butch used other power mowers in the neighborhood.

Plaintiff testified that after Mary Jane was born, in May 1957, defendant's attitude toward her and the boys became worse. She said that on many occasions when defendant returned home in the evening defendant would pick up Mary Jane in front of her and the boys and say, " 'This is my baby, the only thing in the world that means anything to daddy.' " Plaintiff testified that defendant would take the baby into the living room and tell the boys to get out because it was his playtime with his daughter and he didn't want them anywhere around. Defendant testified that the only time he asked the boys to leave the room was when plaintiff was about to change the baby's diapers, because the baby would be in the nude and the boys were at the age of curiosity. Plaintiff testified that defendant was too particular about Mary Jane; that the boys were forbidden to sit on the bed on which the baby's diapers were folded and that she was required to first put down a wrapping blanket on the bed before folding the diapers; that the boys were not allowed to come near the baby for fear they were dirty; that if Mary Jane sneezed or coughed defendant ordered them from the room; that they were continually cautioned about making a noise; and that defendant made the boys watch television in the basement recreation room and refused to permit them to use the television in the parties' combination bedroom-sitting room. Defendant conceded that after the baby was born the second television set, formerly kept in the third bedroom, was moved down to the basement, but stated that the basement had been fixed into a club room to which the boys could bring their friends in the afternoon. Plaintiff testified that she told the defendant that he shouldn't express his preference for Mary Jane in front of the boys, that he should treat them as near alike as he could, and that Butch already felt rejected enough; and that she and defendant had arguments on that subject.

It appears from plaintiff's testimony that in addition to arguments and disputes over the matter of defendant's disciplining of the boys and his partiality towards his own children and Mary Jane, quarrels developed over the family's finances. Plaintiff received $200 a month from her former husband for the support of Butch and Jimmy. In addition, at the time of her marriage, plaintiff enjoyed a spendable income of about $8,000 per year derived as the net rental of barges she owned, the purchase and renting of which had been arranged by her step-father Herman T. Pott. Prior to the marriage, Pott had purchased the house in which plaintiff and her children resided, for which plaintiff paid Pott a rental of $250 per month. There appears to be no dispute in the evidence that at the time of the marriage it was agreed that defendant would contribute into a joint household account the sum of $200 every payday, which was every two weeks, and that plaintiff would pay the remainder of the household expenses, including the rent. Plaintiff testified that instead of $200 defendant frequently gave her only $100, $150, or $175, which was insufficient to meet all the household expenses, and that she bore them out of her own income; that nevertheless defendant complained that she spent too

much and should get by on less, until finally defendant insisted on taking over the marketing and ceased to contribute to the joint household account. Defendant admitted that he took over the marketing but said he did so at plaintiff's request. Plaintiff denied having made such a request. Plaintiff also testified that defendant insisted that all expenditures were to be cut down and that the family was not to go out to dinner because it cost less to eat at home. Plaintiff said that after defendant took over the marketing she frequently did not know what they were going to have to eat, that defendant bought only absolute necessities and that when she bought such things as cupcakes and sweet rolls for the children out of her own money, and defendant learned of it, a terrible argument ensued, in which defendant accused her of spoiling the children, that they didn't need those things. Plaintiff testified that in his effort to cut down expenses defendant said that a light snack would be enough for the boys at night, because they got a big fancy meal at noon at the school they attended. Plaintiff said that she protested, and told defendant the children should have a full meal at night, no matter what they had for lunch.

Plaintiff testified that according to her records she contributed the sum of $5,551.-62 towards the household expenses in 1956, in addition to the rent of $250 per month, and that defendant contributed $4,309.73. In addition, she stated, she paid for the boys' tuition, dental bills, and similar items out of her own income. Defendant did not controvert plaintiff's figures.

Although plaintiff was paying the tuition out of her own income, the boys' attendance at Community School, a private institution, apparently was another source of friction between the parties. Plaintiff testified that defendant did not like private schools, and said it was ridiculous to spend that kind of money on a grammar school education, that his college education hadn't cost as much as plaintiff was throwing away on the two boys. Defendant said he had not forbidden the children to attend Community School, but admitted that he had made a "suggestion" that the boys should go to a public school (which they were attending at the time of trial) because he thought they would be better fitted in a different type of school. He denied that there was any "difficulty" about the private school, but admitted that there was a "difference of opinion" between him and plaintiff on the subject. Defendant testified initially that he could not recall having ever objected to the expense, that it was none of his business, but later said that he may have objected to the expense "to the extent that we were not getting what it was—what they were paying into it."

Plaintiff testified there were also arguments between her and defendant over her parents giving her more money, and that defendant said he thought her parents should give them $3,000 a year more, tax free. Defendant denied that he had ever made such a statement. However, on cross-examination defendant admitted that in a conference between him, plaintiff, and Mr. and Mrs. Pott, to be later discussed, he opened the meeting with the statement that plaintiff's income wasn't sufficient for "The specific requests that they (Mr. and Mrs. Pott) wanted her to spend that money for," which specific requests defendant described as " * * * Community School, another was private camps, doing things of that nature." Defendant admitted that the money used for such expenses were paid for by plaintiff out of plaintiff's own income, and then said that "At the time of our marriage, (plaintiff's) her income was only $250 a month, which went to paying for rent on the house." Asked if plaintiff did not also have other income that went to pay for the children at Community School, defendant admitted that plaintiff received $200 per month from her prior husband, and insisted that all plaintiff had besides that was the $250 per month which went for rent, and that where, the money came from to pay for the children's schooling at Community he didn't know.

Plaintiff testified that defendant always complained that plaintiff's mother interfered in their affairs. Plaintiff related one instance in which she was talking on the telephone to her mother to arrange for the latter to transport Butch from school to a camp picnic, and that when defendant heard that plaintiff was talking to her mother he screamed, loud enough for Mrs. Pott to hear over the telephone, that the mother was always interfering and meddling, and that she was an old battleaxe. Asked on direct examination as to what had occurred, defendant said that, "I don't ever recall screaming at Jane," but did not deny the statements about the mother which plaintiff had attributed to him. Defendant testified that the differences between his in-laws and himself precipitated with the announcement of plaintiff's pregnancy and continued until the separation of the parties. Defendant said that he insisted that a conference be held to discuss, not the problems between him and plaintiff, but those " * * * being created by outside influence," resulting from Mrs. Pott's interference in the family.

If such was defendant's purpose in insisting on the conference, held in December 1957, with the Potts, that subject was never discussed, so far as appears from the record. The evidence shows, rather, that the only matters mentioned were plaintiff's income, and defendant's treatment of Butch and Jimmy. As previously stated, defendant said that he opened the meeting by stating that plaintiff's income was not sufficient for the purposes for which the Potts wanted her to spend it. Plaintiff testified that there was a lot of talk between defendant and her stepfather about depreciation, which she didn't understand. Plaintiff further said that defendant also maintained that plaintiff only made $2,000 a year (presumably from the barges), and that her stepfather replied that what defendant was talking about was depreciation, that plaintiff was spending more than that. Mrs. Pott testified that her recollection of the first thing she heard, as defendant and her husband entered the living room, was defendant telling Mr. Pott: " 'After depreciation, which I don't know too much about, and after taxes are taken out, Jane only makes $2,000 a year' "; and that her husband replied " 'You all are spending it, so she must make more than $2,000 a year.' " Pott testified that he told defendant that any income which he had arranged for plaintiff was his affair, that he had tax problems, and that defendant's suggestions to him, through plaintiff, " * * * like buying the house and $3,000 a month (year?) * * * " were none of defendant's affair; that it was his privilege to handle it his own way because he was giving the money. Defendant testified that Pott informed him that " * * * he was the financial genius of the family and he would figure the finances of the family the way it was less expensive to him and the hell with what I thought * * *."

Regarding the subject of defendant's treatment of the boys, plaintiff testified that her stepfather told defendant that defendant had not been a good father to the children; and that defendant said he knew he had not been a good father and would try to be a better one. Mrs. Pott's testimony was to the same effect, and she added that her husband told defendant that the tool box episode was one of the most cruel things he had ever seen a father pull on a boy. Pott testified that he told defendant his treatment of the children had been horrible, that defendant hadn't been a good father to the boys, and that they were punished too severely for minor wrongdoings. Defendant replied, according to Pott, that Butch required strict attention but that he would be a better father to the children. Although we have carefully searched the transcript we have been unable to find any instance in which defendant denied or disputed the testimony of plaintiff, Pott, or Mrs. Pott regarding the accusations made at the conference as to defendant's treatment of the boys. His only testimony on this phase of the conference were his admissions, on cross-

examination, that during that meeting Pott had mentioned Butch and the tool chest, and that Pott had used the expression that defendant hadn't been a good father to the boys.

It seems apparent from the testimony of both parties that a major cause leading to their separation was a controversy over their estimated Federal income taxes for 1957. Plaintiff testified that when the quarterly bills came in, during 1957, she pointed out to defendant that they were for more taxes than she had ever paid in her life, and asked defendant whether the bills were all hers. She said that defendant insisted that the bills were all hers because his income tax was withheld from his paycheck. Plaintiff testified that she thereupon paid the bills out of her own funds, and the records she introduced in evidence show that she paid the sum of $208 to the District Director of Internal Revenue on January 30, June 15, September 12, in 1957 and on January 13, 1958. Plaintiff testified that when she received the bills of about $600 for the boys' tuition at Community School in January 1958, she found that she did not have sufficient funds in her personal bank account to pay them, and thinking she must have made a mistake, she took her books to the auditor of her stepfather's shipyard, one Brune, who had always assisted her in keeping her books and in making up her income tax returns. She then found out that on the withholding statement filed with his employer defendant had listed as dependents himself, plaintiff, the baby, and plaintiff's boys, Butch and Jimmy. Plaintiff testified that when she returned from the shipyard she and defendant "had a terrible quarrel" and that defendant said he hadn't wanted plaintiff to take the books to the shipyard. Plaintiff testified that she told defendant he had no business claiming Butch and Jimmy as dependents because defendant didn't support them, and that he shouldn't have taken them as deductions. She testified that defendant told her he was the legal head of the household, and

that if plaintiff didn't let him take everybody he would pay only two-fifths of the running expenses, one-fourth of the food bill, and would bring all of Mary Jane's food home with him.

On cross-examination defendant admitted that plaintiff had talked to him about the quarterly bills, and had said that the tax was more than she had paid in the past, and that he told plaintiff that it was the estimated tax based on plaintiff's income. Defendant also conceded that a quarrel ensued in January, 1958, upon plaintiff's return from the shipyard, during the course of which, according to defendant, plaintiff said her stepfather had accused defendant of being a thief, a smart alec and many other things, and had said defendant had outsmarted her out of $500; and defendant testified plaintiff was visibly shaken and made the same accusations against defendant. Defendant testified that he told plaintiff that if that was the way she felt he would borrow the money and pay her the $500; and that he also told plaintiff he would do everything possible to correct what he thought was an error. Plaintiff testified that defendant made no offer to pay the $500 until after the separation. Defendant denied that he had told plaintiff that if he couldn't claim the boys as exemptions that he would pay only two-fifths of the household expenses, or that he had said he would pay only one-fourth of the grocery bill and bring home food for Mary Jane. Defendant testified that after this incident plaintiff became cool and rather depressed and moody, and thereafter didn't have much to say to him.

Defendant testified that he claimed Butch and Jimmy as exemptions for withholding purposes in accordance with instructions given him by Brune at a meeting held in January 1957, between plaintiff, defendant, and Brune. Plaintiff testified that she never heard Brune tell defendant to claim the boys as deductions. Brune was not produced as a witness, and the declaration for 1957 was not produced as an exhibit. How-

ever, defendant introduced in evidence a memorandum which Brune had sent plaintiff, which apparently accompanied the joint declaration for the estimate of the parties' 1957 Federal Income taxes. To quote the memorandum: "(2) You and Joe should both sign (and date) at the bottom of the form; (3) Make check for $208 payable to Internal Revenue Service; (4) Mail check & declaration, not later than April 15 to: District Director of Internal Revenue, Federal Bldg., 12th & Market Sts., St. Louis 1, Mo."

We think it is obvious that Brune must have known that defendant was going to claim Butch and Jimmy as dependents for withholding purposes. How, otherwise, would Brune have been able to arrive at the figure of $208 per quarter for the estimated quarterly tax in 1957? However, we think it is equally obvious from defendant's testimony, as well as plaintiff's, that plaintiff was not aware that Butch and Jimmy were not being claimed as exemptions on her behalf in the determination of the estimated tax plaintiff was to pay for 1957, as had been the case previously; and that plaintiff's incomprehension of the reason for the increase in her quarterly payments was apparent to defendant. From defendant's own evidence it is likewise clear that when plaintiff complained to him about the increased quarterly bills, defendant did not enlighten plaintiff as to the reason for such increase although he was well aware of the cause.

Plaintiff testified in effect that defendant was possessed of a violent temper, and that he frequently screamed and hollered. Defendant denied the accusations.

There was other testimony by Mr. and Mrs. Pott which corroborated plaintiff's complaints as to the treatment of the boys, the defendant's opposition to sending them to Community School, and the defendant's statement that plaintiff's parents should give the parties $3,000 a year more, tax free. On defendant's part, records of the Community School were produced which indicated that Butch was inclined to do what he wanted, showed slight respect for authority, and required constant supervision. There was corroboration by Savannah Cox, a former maid for plaintiff, of defendant's denial of mistreatment of the boys, but the witness, then working for defendant, admitted that a good number of times she heard plaintiff object to the defendant's disciplining of the boys, that she heard the plaintiff and defendant argue about defendant's disciplining of Butch, and that she had seen the plaintiff in tears over the matter. There was also considerable evidence of events which transpired after the separation, and of others which occurred after the petition was filed. It appears, for example, that after the separation a Father-Son dinner was to be held at Community School, that Butch did not want to be accompanied by his grandfather, Pott, because the latter would be the only grandfather there, and that at Butch's request plaintiff asked defendant to go with Butch, which defendant did. There was also evidence that after the suit was instituted, violent arguments ensued between plaintiff and defendant over defendant's temporary custody of Mary Jane. Plaintiff testified that on one occasion defendant called plaintiff a liar, and on being refused admittance, beat on the door; and that on another, on a Sunday afternoon, about the middle of September 1958, on advice of counsel, plaintiff refused to let defendant have the child, and that defendant screamed that plaintiff had been listening to her mother, who was neurotic, that plaintiff was an incompetent mother and not fit to raise the child, and that he was going to have both plaintiff and her mother committed. Defendant testified that when plaintiff told him she was denying him the right to see Mary Jane on the advice of her lawyer, he told her he would ask his own lawyer to start proceedings so that he could have visitation rights; that plaintiff wanted to know on what grounds he would do it; " * * * and I said that I would say she (plaintiff) was under the influence of a psychoneurotic mother."

Defendant's first point on appeal is that plaintiff failed to prove that defendant committed acts constituting indignities upon which a decree of divorce can be granted under Section 452.010 RSMo 1959, V.A. M.S. In his argument under this point defendant says that even if plaintiff's evidence as to defendant's harsh treatment of Butch is accepted as true, such conduct would not constitute an indignity. In the first place, the matter of defendant's disciplining of Butch was only part of plaintiff's grounds for divorce, and secondly, the case of Greenbury v. Greenbury, Mo.App., 223 S.W.2d 153, cited by defendant, does not support his contention. This court did not hold in that case that mistreatment of the parties' children by defendant did not amount to an indignity. All that it held was that the evidence did not sustain plaintiff's charge that defendant had mistreated the children; but in doing so it tacitly recognized that such mistreatment, if sustained by the evidence, would have been an indignity under the statute. To the same effect see Cadenhead v. Cadenhead, Mo. App., 265 S.W.2d 426. And although there was no discussion of the question, it seems to have been held in Herriford v. Herriford, 169 Mo.App. 641, 155 S.W. 855, and Richardson v. Richardson, Mo.App., 270 S.W.2d 68, that mistreatment of a child by one spouse constituted an indignity to the other. Our statute, Section 452.010, does not define indignities, and requires only that they be such as to render the aggrieved's condition "intolerable." It would be difficult to imagine a course of conduct that would be more intolerable or unbearable, or that would be more subversive of the family relationship, than harsh and abusive treatment of a child. We have no hesitancy in saying that such conduct constitutes an indignity under our statute.

Defendant argues as to the weight we should give plaintiff's evidence regarding defendant's treatment of Butch. It is true that we try a case of this kind de novo, and may enter such judgment as the trial court should have entered. But it is likewise true that where, as here, there is an irreconcilable conflict in the evidence, great deference is afforded the finding of the trial court who had the parties and witnesses before him and was in a much better position to judge of their credibility. The instant case falls within that rule.

Lastly, defendant maintains that plaintiff was not entitled to a decree of divorce because the evidence showed that plaintiff was not an injured and innocent party. The trial court specifically found that she was. The rule is that one seeking a divorce is not required to conclusively approve freedom from all fault, but only that, under all of the circumstances of a particular case, he had not been guilty of conduct constituting a ground or grounds for divorce. Simon v. Simon, Mo., 248 S.W.2d 560; Pippas v. Pippas, Mo.App., 330 S.W.2d 132. It is argued by defendant that plaintiff refused to speak to defendant for extended periods of time; that she refused to enlighten defendant as to the amount of her income and the business dealings she had; that she refused to resume marital relations with defendant after plaintiff had been unable to engage in them for a period because of an operation for a hernia; and other matters. The evidence showed only one instance of a failure to speak, not a course of conduct; and as to that instance the testimony of plaintiff was that she and defendant didn't speak to each other, not that plaintiff alone refused to do so. Nor was there any testimony that plaintiff *refused,* on request, to tell defendant about her income. She may not have voluntarily informed defendant about certain barge transactions which were handled at her stepfather's place of business, but her testimony was that even prior to the marriage she told him the amount of her spendable income and the manner in which it was derived. Defendant adopts an inconsistent position regarding plaintiff's conceded refusal of consortium, from the

latter part of January, 1958 to the separation. In the first part of his brief defendant argues that allegations and proof as to defendant's refusal to engage in conjugal relations with plaintiff should not be considered because the " * * * refusal of marital rights does not constitute a general indignity, * * *" citing Pollard v. Pollard, Mo.App., 98 S.W.2d 132 and Gruner v. Gruner, 183 Mo.App. 157, 165 S.W. 865. If that doubtful proposition is correct plaintiff's like refusal would not prevent her from being an innocent and injured party. If not correct, it would be but a single indignity, and therefore insufficient grounds for divorce. Moore v. Moore, Mo.App., 337 S.W.2d 781. Furthermore, plaintiff's refusal did not occur until the relationship between the parties had become strained, following the income tax incident and after plaintiff had suffered most of the indignities stated, and may be considered an avoidance of condonation. Defendant also cites his own testimony that plaintiff had accused him of stealing $500 from her in the estimated tax incident. But plaintiff never testified that she had accused defendant of stealing from her; her testimony was that she told defendant he had no business taking Butch and Jimmy as dependents, because he didn't support them. We have examined the other matters referred to in defendant's argument and find them equally insufficient to bar plaintiff from being an injured and innocent litigant.

It is the recommendation of the Commissioner that the judgment be affirmed.

PER CURIAM.

The foregoing opinion by DOERNER, C., is adopted as the opinion of the court. Judgment is affirmed.

ANDERSON, P. J., and WOLFE, J., concur.

RUDDY, J., not participating.