# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00410-COA

**CHRISTA STAPLES CANNON**                                             **APPELLANT**

**v.**

**CHRISTOPHER CANNON**                                                 **APPELLEE**

DATE OF JUDGMENT:                12/15/2021
TRIAL JUDGE:                     HON. RHEA HUDSON SHELDON
COURT FROM WHICH APPEALED:       LAMAR COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:          RISHER GRANTHAM CAVES
ATTORNEY FOR APPELLEE:           MICHAEL V. RATLIFF
NATURE OF THE CASE:              CIVIL - DOMESTIC RELATIONS
DISPOSITION:                     AFFIRMED IN PART; REVERSED AND
                                 REMANDED IN PART - 11/28/2023
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., WESTBROOKS AND EMFINGER, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1.     On December 15, 2021, the Lamar County Chancery Court entered a judgment granting a divorce to Christopher Cannon on the ground of cruel and inhuman treatment. Christa Cannon appeals (1) the grant of divorce on this ground, (2) the chancery court's determination that Christopher's real estate business was a separate, non-marital asset, and (3) the chancery court's failure to trace any funds that Christa contributed to the purchase and renovation of the marital home. We find no error in the chancery court's decision regarding issues one and three; however, the chancery court erred when finding that the real estate business was a separate, non-marital asset. Therefore, we affirm in part and reverse and remand in part.

## FACTS AND PROCEDURAL HISTORY

### I.     Background

¶2.     Christopher and Christa were married on April 17, 2018, and separated on or about April 1, 2020.  This was the second marriage for both parties.  Christopher had three children from a prior marriage: Connor, Charles, and Carly.[1]  The couple produced no children from their union.

¶3.     On October 2, 2020, Christopher filed his complaint for divorce against Christa, alleging habitual cruel and inhuman treatment.  In response, Christa filed a letter with the chancery court expressing that she would be representing herself and that she did not consent to a divorce due to religious reasons.  The clerk labeled this letter as Christa's response on the docket.  On May 10, 2021, before a trial could commence, Christopher filed a motion for a citation of contempt, for an accounting, and for the payment of funds.  He alleged that Christa had kept all the money received from the couple's 2019 tax refund that was deposited in the couple's joint banking account, as well as COVID-19 relief funds meant for Christopher and his three children.  The motion was not set for a hearing but was addressed during trial.

### II.     Trial

#### A.     Christopher Cannon's Testimony

¶4.     On October 13, 2021, the chancery court commenced a trial on the merits.  At the trial,

---

[1] We use pseudonyms to protect the children's privacy.  At the time of the trial, which was held approximately one year after the separation, Connor was twenty, Charles was fourteen, and Carly was twelve.

Christopher testified that he was a real estate broker and that he owned his own business buying and selling real estate. He testified that his business had been established in 2013, five years before his marriage to Christa. Shortly after the marriage, Christopher quit his job to pursue his business full-time.

¶5. During his cross-examination by Christa, Christopher testified about an investment property called "Emerson" that he had bought and sold. According to his testimony, the couple agreed to purchase Emerson as an investment property using the income from Christopher's business. A subsequent loan was taken out on the property in both parties' names. When the investment property was sold, Christa and Christopher split the proceeds.

¶6. When Christopher and Christa met, they each owned a home. Christopher testified that the couple first moved into Christa's home, along with the children. They intended to sell her home and buy a more spacious house so that the children could each have his or her own room. The new home was purchased under Christa's name alone so that Christopher could keep his "credit available to do [his] business." The new house, located on Madison Place in Hattiesburg, was purchased with a "bridge loan,"[2] which utilized a portion of the equity from Christa's home (where the family lived). Christopher's testimony indicated that the proceeds from the sale of Christa's home were also used for renovations of the new home at Madison Place.

¶7. The parties undertook extensive renovations to the marital home. Christopher testified

---

[2] A bridge loan is "a sum of money lent by a bank to cover an interval between two transactions, typically the buying of one house and the selling of another." *Bridge Loan*, New Oxford American Dictionary 216 (3d ed. 2010).

3

that although the parties agreed to spend approximately $35,000 to $45,000 on renovations, Christa unilaterally decided that the couple would incur an additional $100,000 in renovation costs. Christopher provided the court with some documentation of expenses he incurred on his credit cards for the renovations, which totaled between $20,000 and $25,000 in renovation materials. Christopher testified that the renovations "created an immense amount of stress." The family was required to move into the house before the renovations were complete so that the children could start school in August. After the couple separated, Christa continued to live at the marital home. Christopher requested the chancery court to order that the Madison Place home be sold and that the couple split the proceeds.

¶8. Christopher also testified that before his marriage to Christa, he had a close relationship with his children. He and his ex-wife shared custody of the children on an alternating weekly schedule. Each parent had custody of the children on Monday, Tuesday, Friday, Saturday, and Sunday on alternating weeks. Christopher and his ex-wife had a "great relationship" and had gotten "to a point of really good co-parenting." After his marriage to Christa, though, the close relationship with his children began to break down due to the "toxic" and tension-filled environment Christa allegedly created. His ability to co-parent with his ex-wife suffered as well due to Christa's alleged mistreatment of his children.

¶9. Christopher testified that Christa "verbalized" to him that she "hated" his children, and she did so at a time when his children were present in the home. He testified that Christa's unreasonable rules in the home made everyone uncomfortable. He also testified that Christa publicly embarrassed the children at gatherings, cursed at him in front of his

4

children, made derogatory remarks about his children, and intentionally interfered in his one-on-one time with his daughter.

¶10.    Christopher testified that Christa would become angry over small matters. Specific examples include when Charles, Christopher's twelve-year-old son, forgot his coat at his mother's house. In that instance, Christa forced Charles to wait on the bus in "30 to 40 degree[]" temperatures with no coat even though he had a jacket available to him at Christopher's house. Charles had no coat for the entire day. Christopher also testified that Christa yelled at Charles at a gathering of family and friends in a way that embarrassed him and "made everyone uncomfortable." And Christopher testified that Christa repeatedly called Connor "lazy" even though Connor was a high-achieving high-school student with a part-time job. Christopher stated Christa once prohibited Connor from coming over to the house to wash clothes (without Christopher's knowledge), which impacted his relationship with his eldest son.

¶11.    Christopher's testimony reflects that his youngest child Carly was most affected by Christa's conduct. Christopher testified that Christa "constantly harped on [Carly]" about her weight and eating habits. Christopher testified about a particular incident when Carly had poured some cereal into a bowl for breakfast. Christa scooped some of the cereal out of the bowl and back into the box and told Carly "that was way too much" and that she "would never lose weight eating that much." After that incident, Christopher testified that Carly was "devastated" and crying uncontrollably at school. She was sent to the school counselor, who called Carly's mother regarding Carly's distress. According to Christopher, Carly was so

stressed by his home environment that she "developed a problem with pulling her eyelashes and eyebrows out"—a problem she did not have before Christopher and Christa were married.

¶12. According to Christopher, his relationship with his children has been severely damaged. He stated that the children began to avoid going to their father's home. They also chose to avoid long-established annual family events with their father. Christopher stated that although the relationship with his children had improved since his separation from Christa, it had not yet been repaired. Finally, Christopher testified that the tension and stress from the marriage and the disconnect from his children had given him high blood pressure, which he was being treated for. He stated that Christa's treatment of his children left him unable to function as a husband to Christa in the marriage and perform the duties a marriage required.

### B. Corroborating Witnesses

¶13. Bryan Woods testified on Christopher's behalf. Bryan was the brother-in-law of Christopher's ex-wife. Bryan confirmed that Christopher had a good relationship with his ex-wife and children before his relationship with Christa. He also witnessed Christa constantly critiquing Carly about her calorie intake and weight. He mentioned a specific visit to a restaurant where Christa told Carly in front of everyone that "she couldn't eat certain things because of her weight." At the time, Carly was around eight years old. Bryan stated that these comments would "depress [Carly]." He corroborated that Christa's behavior drove a wedge between Christopher and his children. Bryan stated that because Christa "treated

6

them bad[,] . . . they didn't want to be around her [or] have anything to do with her." He noted Christopher's behavior and demeanor had changed, and Christopher appeared to be depressed and "not in good shape."

¶14.  Christopher's eldest son, Connor, testified in support of his father. Connor repeated that Christopher had a good relationship with the children and their mother before his marriage with Christa. He also corroborated that Christa's frequent commentary on Carly's eating habits and weight "destroyed any self-confidence that my sister had [in] herself." Connor listed many incidents when Christa made the family feel embarrassed and uncomfortable in public by becoming unreasonably angry over small matters. One example Connor testified about was an occasion when the family went to a fast-food restaurant while on vacation. Christa, after complaining about "how nasty and greasy the food was," suddenly got up and left the restaurant. She drove away in the family's car and left them stranded at the fast-food restaurant in Texas. Connor did not state how long Christa was gone, but he stated that she eventually came back to retrieve them. Connor also testified about how Christa would belittle and demean him in family conversations. Connor testified that Christa's behavior was more than just unkindness and rudeness and that it had affected his father's health.

¶15.  Francis Cullop[3] was Christopher's final corroborating witness. Francis was Christopher's business partner and friend and was the person who introduced him to Christa. Francis confirmed that Christopher and his ex-wife co-parented the children well before his

---

[3] The transcript uses both "Francis" and "Frances" when referring to this witness. We use "Francis."

marriage to Christa and that Christopher was a great father who was "very focused on his kids." Francis corroborated Christopher's story about Christa's reaction to small matters, specifically when she yelled at Charles during a gathering. Francis added that Charles "has some anxiety, and he sticks pretty close to Chris, and he was sitting on the sofa with Chris to watch football." She explained that Christa persisted in telling him to leave the room and that it "became uncomfortable for all of us . . . because she just wouldn't let it go. . . . [I]t should [not] have been that big of a deal."

¶16. Francis also corroborated that there were several other incidents involving Christa and the children. She testified that "Christa was definitely obsessed with . . . [Carly's] weight, and everything she ate, and what she wore." She testified that "there were no boundaries with the children" and that Christa's behavior alienated the children from their father. She stated that Christa once told her that she was "highly jealous" of the time Christopher spent with his children. Francis believed that Christa wanted Christopher to "pick [her]" over the children. To support this assertion, she gave the example of Christa interfering with Christopher's spending time alone at the mall with Carly. She also confirmed that Christa expressed to her, "I hate his kids." Additionally, Francis described an incident when her own children were left in Christa's care. Francis said that she was gone for only four hours, but her children reached out to her over their iPad for assistance because of something that happened with Christa. When Francis arrived, her children were in tears and begged her to "please don't leave us with [Christa] again." Finally, Francis also corroborated that Christopher was experiencing depression and that his blood pressure was high due to the

8

stress from his marriage to Christa.

## C. Christa Cannon's Testimony

¶17. Christa, representing herself, testified on her own behalf. Christa first testified that she was a pediatric nurse. She stated that she loved Christopher and the children and wished to continue in the marriage because it was a "covenant I made with [Christopher] and God." She testified the couple decided together that Christopher should quit his regular job to focus on building his real estate business.

¶18. Christa testified that they both decided to purchase a larger house for the children's sake. She also testified that she chose to "gut the place" due to pet damage from the previous owners. She said she knew that "[Christopher] was distraught about the amount of money spent at the house" on renovations. Specifically, she said that Christopher told her he was getting "chest pains" from the amount of money she was spending on the house. She testified that she "told him to relax." Christa agreed that the Madison Place home was a marital asset.

¶19. Christa argued that she was entitled to a portion of Christopher's business because it was marital property. Christa testified that they bought the investment property at Emerson together to "make some money on it and pay off the debt at Madison Place[.]" Christa testified that the Emerson property was a joint undertaking and that she

> went and got a lot of the credit for a $100,000 established on my W2, and we spent $75,000 on the house. I moved furniture into the house and out of the house and cleaned the house and talked with the yard guy about what needed to be done, planting flowers, so I had a lot to do with the house. I actually showed the house and found the guy that . . . did buy the house. I actually found him and met the girlfriend first.

Christopher and Christa profited more than $18,000 from the sale of the Emerson property, and Christa received half of the proceeds. She testified that she used her half to pay the mortgage and bills at the Madison Place home.

¶20. Christa acknowledged that she kept the prior year's income tax refund but explained that was because in 2018 the couple's tax refund was used to pay back taxes Christopher owed. She explained that she kept Christopher's and the children's COVID-19 stimulus money payments because she "was getting no money from Chris."

¶21. Christa addressed the incidents other witnesses discussed during their testimonies. She explained she banned Connor from the house without Christopher's permission because she thought she had been exposed to COVID-19. She acknowledged withholding Charles' coat from him in frigid weather but stated that she did not believe this was harmful. She admitted that "maybe I did overstep bounds" when it came to Carly, "but I never told [Carly] that she was fat." Christa also apologized for the cereal incident and explained that she never wanted to hurt Carly. She explained that she loved the children and did her best to build a relationship with them, but she admitted that her relationship with Carly "got kind of sideways." On cross-examination Christa further admitted that she had "overstepped boundaries" with all the children and acknowledged it was possible to harm children in ways other than physical violence.

### III. Post-trial Proceedings

¶22. On December 15, 2021, the chancery court entered an opinion and final judgment granting the divorce on the ground of habitual cruel and inhuman treatment. The chancellor

10

found that Christopher's testimony was credible and that "Christa did not deny or contradict the testimony of Christopher regarding her relationship and interactions with his children." The chancellor found "that Christa's hatred of his children, constant criticism of his daughter concerning her weight[,] and overbearing and demanding attitude toward them created an alienation between Christopher and his children such that Christopher finds continuing in the marriage infamous and impossible."

¶23. Next, the chancellor determined that Christopher's real estate business was not a marital asset and was not subject to distribution. The chancellor found that "Christa provided little testimony and no evidence to support her assertion" that the business was a marital asset.

¶24. Finally, the chancellor found that the parties had agreed the Madison Place home was marital property subject to equitable division, and they agreed that the value of the home was $300,000. The chancellor also found the parties agreed that proceeds from the sale of Christa's home were used toward renovations along with credit cards. The chancellor analyzed each of the *Ferguson*[4] factors in turn before dividing the property. Most pertinent, the chancery court found that "both parties made a substantial contribution to the accumulation of the marital residence" and "that the use of the proceeds from Christa's separate home toward the purchase and renovation of the marital home were commingled and thus converted to marital." The chancellor declined to find that Christa had dissipated assets even though "the testimony and evidence established that Christa expended more money on

---

[4] *Ferguson v. Ferguson*, 639 So. 2d 921 (Miss. 1994).

renovations than was agreed upon by Christopher." With regard to any other factor, which in equity, should be considered, the chancellor found that Christa and Christopher were in similar financial situations, and "both have worked and contributed economically to the value of the marital estate." But the chancellor also found fault on Christa's part, finding that "Christa's misconduct with her cruel and inhuman treatment of Christopher negatively impacted the stability and harmony of the marriage."

¶25. The chancellor awarded Christa use and possession of the marital home but ordered that it should be placed on the market and sold for fair market value. Christa was responsible for the mortgage and utilities, and both parties were ordered to divide the costs of property insurance, taxes, and large repairs. The home's equity was to be divided "on a 50/50 basis to the parties." Christa was further ordered to return the children's COVID-19 stimulus payments to Christopher.

¶26. Two weeks later, Christopher filed a petition for a citation of contempt against Christa, alleging that she had not returned the children's stimulus funds to him and that she would not allow walk-throughs of the home by potential buyers. He also alleged that although the couple was ordered to replace the roof of the marital home with traditional shingles, Christa had unilaterally decided to replace it with a tin roof, which would make the house less marketable. On December 27, 2021, attorney Risher Caves entered his appearance on behalf of Christa, who had until that point represented herself.

¶27. On December 27, 2021, Christa's attorney filed a motion for additional findings and conclusions under Mississippi Rule of Civil Procedure 52(b). She alternatively moved for

a new trial under Rule 59(a) or to alter or amend the judgment under Rule 59(e). Christa argued in this motion that the chancery court committed a clear error of the law by granting the divorce on the ground of habitual cruel and inhuman treatment because "Christopher failed to furnish the Court with sufficient proof of habitual cruel and inhuman treatment." Christa also argued that the court erred by determining the marital business was Christopher's separate, non-marital property. She attached documents from the Secretary of State's website showing that Christa was listed as a member of the business in 2018 and 2019. Christa acknowledged the documents were not presented as evidence at the trial but urged the chancery court to take judicial notice of the public records. Finally, Christa alleged that the chancery court erred by not tracing the proceeds from the sale of Christa's separate, pre-marital home and, instead, finding that the funds were commingled into the alleged marital estate at Madison Place.

¶28. On February 22, 2022, Christopher filed his response to Christa's motion, arguing that the chancellor correctly applied the law to the facts and that Christa merely disagreed with the chancery court's finding. On February 28, 2022, a hearing on Christa's motion commenced. On April 1, 2022, the chancery court issued a brief order denying Christa's motion for additional findings under Rule 52(b) and her motion for a new trial under Rule 59(a) or motion to alter or amend judgment under Rule 59(e). On April 28, 2022, Christa filed her notice of appeal from the final judgment and the order denying her motion.

**STANDARD OF REVIEW**

¶29. "This Court's standard of review in domestic-relations matters is extremely limited."

13

*Stuckey v. Waid*, 195 So. 3d 872, 875 (¶13) (Miss. Ct. App. 2016) (quoting *Phillips v. Phillips*, 45 So. 3d 684, 692 (¶23) (Miss Ct. App. 2010)). "[W]e 'review the facts involved in rendering a divorce decree in a light most favorable to the appellee.'" *Roley v. Roley*, 329 So. 3d 473, 491 (¶49) (Miss. Ct. App. 2021) (quoting *Dickinson v. Dickinson*, 293 So. 3d 322, 326 (¶5) (Miss. Ct. App. 2020)), *cert. denied*, 329 So. 3d 1200 (Miss. 2021). "We further recognize that '[c]hancellors are afforded wide latitude in fashioning equitable remedies in domestic-relations matters[.]'" *Id.* (quoting *Dickinson*, 293 So. 3d at 326 (¶5)). "In domestic-relation cases, our review is limited to whether the chancery court's findings were manifestly wrong or clearly erroneous, or the court applied the wrong legal standard." *Gwathney v. Gwathney*, 208 So. 3d 1087, 1088 (¶5) (Miss. Ct. App. 2017) (citing *Lomax v. Lomax*, 172 So. 3d 1258, 1260 (¶5) (Miss. Ct. App. 2015)). "If substantial evidence in the record supports the chancellor's findings of fact, we will not disturb his [or her] decision." *Id.*

## DISCUSSION

### I.  Divorce on the Ground of Habitual Cruel and Inhuman Treatment

¶30.  Christa argues on appeal that the chancery court erred by granting Christopher a divorce based on habitual cruel and inhuman treatment.  She alleges that (1) Christopher failed to prove by a preponderance of evidence that Christa's behavior rose to the level required for habitual cruel and inhuman treatment and (2) Christopher's health complaints were not causally connected to Christa's conduct.  We disagree and affirm the chancery court's judgment of divorce on this ground.

14

¶31. Mississippi Code Annotated section 93-5-1 (Rev. 2021) provides the statutory grounds for divorce in our State. One ground on which a chancery court may grant a fault-based divorce is "[h]abitual cruel and inhuman treatment, including spousal domestic abuse." *Id*. "The plain and ordinary language of section 93-5-1 contains two prongs, setting forth two types of conduct sufficient to establish this ground for divorce." *Jones v. Jones*, 43 So. 3d 465, 473 (¶13) (Miss. Ct. App. 2009). This court has defined the two prongs as conduct that

> (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief or (2) is so unnatural and infamous as to make the marriage revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance.

*Id*. at 469 (¶9) (quoting *Kumar v. Kumar*, 976 So. 2d 957, 961 (¶15) (Miss. Ct. App. 2008)).

¶32. "Habitual cruel and inhuman treatment may be established by a preponderance of the evidence, rather than by clear and convincing evidence." *Bullock v. Bullock*, 699 So. 2d 1205, 1209 (¶17) (Miss. 1997) (citing *Smith v. Smith*, 614 So. 2d 394, 396 (Miss. 1993)). But "[t]here must be corroboration of the complaining party's testimony." *Id*. (citing *Peterson v. Peterson*, 648 So. 2d 54, 57 (Miss. 1994)). "In reviewing a cruelty-based divorce, 'there is a dual focus on the conduct of the offending spouse and the impact of that conduct on the offended spouse.'" *Harmon v. Harmon*, 141 So. 3d 37, 42 (¶16) (Miss. Ct. App. 2014) (quoting *Smith v. Smith*, 90 So. 3d 1259, 1263 (¶11) (Miss. Ct. App. 2011)). The "impact of the conduct on the plaintiff is crucial[;] thus we employ a subjective standard." *Faries v. Faries*, 607 So. 2d 1204, 1209 (Miss. 1992). "Instead of using an ordinary, reasonable-person standard, we concentrate on the conduct's effect on the particular offended

spouse." *Harmon*, 141 So. 3d at 42 (¶16) (citing *Smith*, 90 So. 3d at 1263 (¶11)).

¶33. This case proceeded under the second prong of habitual cruel and inhuman treatment. Therefore, we focus on whether Christa's conduct was so "unnatural and infamous" that the marriage became revolting to Christopher and rendered it impossible for him to discharge his marital duties. "The words 'unnatural and infamous' have not been precisely defined by precedent because the plain meanings of those words are sufficient." *Bodne v. King*, 835 So. 2d 52, 58 (¶23) (Miss. 2003). While physical violence against the offended spouse is not required as proof, "mere unkindness, rudeness, petty indignities, frivolous quarrels, incompatibility or lack of affection are not sufficient." *Id*. at 58-59 (citing *Steen v. Steen*, 641 So. 2d 1167, 1170 (Miss. 1994); *McKee v. Flynt*, 630 So. 2d 44, 48 (Miss. 1993)). Conduct necessary for this ground must be reviewed on a case-by-case basis. *Id*. at 58. Our Supreme Court has determined that "it is impossible to provide a list of unmistakable bright-line markers of such conduct." *Id*.

¶34. Even so, our Supreme Court has expressly stated that "mistreatment or abuse" of one spouse's child may constitute cruelty under this prong. *Pittman v. Pittman*, 195 So. 3d 727, 734 (¶15) (Miss. 2016). In *Pittman*, the Supreme Court made clear that

> [s]uch conduct may certainly be "so unnatural and infamous as to make the marriage revolting to the" party seeking relief and "render it impossible for that spouse to discharge the duties of the marriage, thus destroying the basis for its continuance[.]" . . . Indeed, "[i]t would be difficult to imagine a course of conduct that would be more intolerable or unbearable, or that would be more subversive of the family relationship, than harsh and abusive treatment of a child." *Greco v. Greco*, 356 S.W.2d 558, 566 (Mo. Ct. App. 1962).

*Id*. (other citation omitted). This treatment of children need not be considered in conjunction

16

with other conduct. *See* Deborah H. Bell, *Bell on Mississippi Family Law* § 4.03[9][b] (3d ed. 2019) ("[A]busive treatment of children may support grant of a divorce even in the absence of other harmful conduct.").

¶35. In support of Christa's assertions that her behavior did not rise to the level of cruel and inhuman treatment, Christa relies on cases that she alleges have "more extreme" mistreatment directed toward the children.[5] But we must again state that "[w]hether the requirements to obtain a divorce on the ground of cruel and inhuman treatment are satisfied is a fact-intensive inquiry that generally must be decided on a case-by-case basis." *Roley*, 329 So. 3d at 495 (¶60) (quoting James W. Shelson, *Mississippi Chancery Practice* § 38:5 (2020)). In these factually intensive cases, a chancellor is in the best position to see the witnesses' demeanor and hear the witnesses testify. *Anderson v. Anderson*, 310 So. 3d 1176, 1184 (¶32) (Miss. Ct. App. 2020). This discretion allows the chancellor to make determinations of truthfulness, reliability, and credibility and to determine whether "the proof met or fell short of habitual cruel and inhuman treatment." *Roley*, 329 So. 3d at 495 (¶61) (quoting *Gwathney*, 208 So. 3d at 1090 (¶9)). Comparison to other cases is not necessarily an apples-to-apples comparison.

¶36. Here, Christa's mistreatment of the children was extensively documented. Both Christopher and his witness Francis testified that Christa told them she "hated" Chris' children. Testimony supported that Christa directly interfered with the children's relationship

---

[5] Specifically, Christa cites *Pittman v. Pittman*, 195 So. 3d 727 (Miss. 2016), *Keller v. Keller*, 763 So. 2d 902 (Miss. Ct. App. 2000), and *Roley v. Roley*, 329 So. 3d 473 (Miss. Ct. App. 2021).

with their father. Christopher testified regarding specific incidents of Christa's critical and demanding attitude toward the children, as well as her overreactions to minor issues, such as requiring his child to stand outside without a coat in near-freezing weather because he forgot his usual coat at his mother's house.

¶37. Of particular concern was Christopher's testimony regarding Christa's behavior toward Carly. While Christopher testified that Christa was "constantly on" Carly about her eating habits and weight, his witness Francis characterized Christa's behavior as "obsessed." Bryan testified that Christa's criticisms of her eating and drinking depressed Carly. And Connor testified that Christa's conduct "completely destroyed my sister's self-esteem." Christopher's testimony was that Carly's mental health deteriorated under Christa's demands to the point where she had to see the school counselor after crying uncontrollably at school, and he said that "she developed a problem with pulling her eyelashes and eyebrows out." He stated that he did not recall Carly having these issues before he married Christa.

¶38. Corroborating testimony from Conner, Bryan, and Francis described additional incidents of Christa's mistreatment of Christopher's children. Connor testified that the family was stranded at a fast-food restaurant in Texas when Christa drove away in their only vehicle. Francis related an incident in which a "highly jealous" Christa attempted to interfere in Christopher's time with Carly. Christopher, Connor, and Francis all testified that these kinds of stressful interactions and "continual conflict" had been ongoing since the beginning of the marriage. Christopher testified that the persistent mistreatment of his children made it impossible for him to continue in the marriage. He further testified that he could not fulfill

18

his duties of the marriage. Christa did not deny or refute any of the behaviors of which she was accused.

¶39. Additionally, Christopher testified that Christa's conduct toward his children and his subsequent alienation from them had increased his blood pressure, a condition for which he sought medical help. Francis corroborated that Christopher had acquired high blood pressure as a result of his marital situation. Bryan and Francis added testimony that he appeared depressed and that his demeanor had changed dramatically as a result of his marriage and the subsequent alienation from his children.

¶40. Christa argues in her brief that Christopher's "belief" that Christa's conduct and his subsequent alienation from his children caused his high blood pressure was insufficient to establish that her conduct was causally connected to any adverse impact on his health. We disagree because this Court has held that a spouse's testimony about the harmful effects and negative impact of the offending spouse's conduct on the offended spouse is sufficient. *Roley*, 329 So. 3d at 495 (¶62); *McIntosh v. McIntosh*, 977 So. 2d 1257, 1264 (¶27) (Miss. Ct. App. 2008). "No expert medical testimony on the point of [Christopher's] health" is required. *Id*. at 494 (¶59) (quoting *Smith*, 90 So. 3d at 1267 (¶28)). Based on the testimony from Christopher and his corroborating witnesses, the chancellor found that Christopher experienced high blood pressure due to what he described as the "stress of dealing with this marriage and . . . the disconnect between me and my kids." Further testimony indicated that Christopher had become depressed and that his energy level and demeanor had changed as well. Given this testimony, the chancellor did not commit reversible error in determining

19

Christopher's health deteriorated as a result of his marriage to Christa.

¶41. "It is common sense that abuse or mistreatment of a person's child may constitute cruelty to that person." *Pittman*, 195 So. 3d at 734 (¶15). Based upon the extensive undisputed testimony about Christa's mistreatment and "hatred" of Christopher's children, we find that there is substantial evidence in this case supporting the chancellor's determination that Christopher met his burden of proof and is entitled to a divorce on the ground of habitual cruel and inhuman treatment. Accordingly, we affirm the chancery court's grant of divorce on this ground.

## II. Determination that Christopher's Real Estate Business Was Separate, Non-marital Property

¶42. Christa also argues that the chancellor was in error when she determined that the real estate business was Christopher's separate, non-marital asset. For the reasons analyzed below, we agree.

¶43. "According to this Court's ruling in *Johnson v. Johnson*, 650 So. 2d 1281, 1287 (Miss. 1994), the first step before division of the assets is for the chancellor to characterize the parties' assets as marital or non-marital." *Craft v. Craft*, 825 So. 2d 605, 608 (¶11) (Miss. 2002). Marital property is defined as "any and all property acquired or accumulated during the marriage." *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994). "The second step is for the chancellor to equitably divide the marital property according to the guidelines set forth in *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994)." *Craft*, 825 So. 2d at 608 (¶11). "The law presumes that all property acquired or accumulated during marriage is marital property." *Castle v. Castle*, 266 So. 3d 1042, 1049 (¶28) (Miss. Ct. App. 2018)

20

(citing *Stroh v. Stroh*, 221 So. 3d 399, 409 (¶27) (Miss. Ct. App. 2017)). "The party claiming that the asset is separate, nonmarital property has the burden of proof and must overcome the presumption that the asset is marital property." *Id*. "This burden goes beyond a mere demonstration that the asset was acquired prior to marriage." *A & L Inc. v. Grantham*, 747 So. 2d 832, 839 (¶23) (Miss. 1999) (citing *Hemsley*, 639 So. 2d at 915).

¶44. In the opinion and final judgment, the chancery court noted, "Christopher denies that the business was a marital asset. *Christa provided little testimony and no evidence to support her assertion*. Thus the Court finds that Christopher's real estate business is not a marital asset subject to distribution." (Emphasis added). This was an erroneous finding because the burden was not on Christa to establish that it was marital property. Instead, the burden was on Christopher to supply the court with evidence proving that the real estate business was separate, non-marital property. Christopher testified that he formed the business in 2013 (five years before their marriage). However, as previously mentioned, "a mere demonstration that the asset was acquired prior to marriage" is not enough. *Id.* Christopher failed to provide any evidence showing that he acquired any properties before the marriage. Christopher's Rule 8.05 financial statement reveals that he owned four properties aside from the marital home, but there are no dates to confirm when these properties were acquired. *See* UCCR 8.05.

¶45. This Court has provided guidance to chancery courts on how they should proceed when there is little evidence to make a decision on an equitable distribution of marital assets:

> "The equitable distribution of marital assets is within the discretion of the chancery court." *Sproles v. Sproles*, 782 So. 2d 742, 748 (¶22) (Miss. 2001).

> At the same time, "it is incumbent upon the parties, and not the chancellor, to prepare evidence touching on matters pertinent to the issues to be tried." *Benton v. Benton*, 239 So. 3d 545, 548 (¶11) (Miss. Ct. App. 2018) (quoting *Dunaway v. Dunaway*, 749 So. 2d 1112, 1118 (¶14) (Miss. Ct. App. 1999)). "Where a party fails to provide accurate information, or cooperate in the valuation of assets, the chancellor is entitled to proceed on the best information available." *Id*. (quoting *Stribling v. Stribling*, 906 So. 2d 863, 870 (¶25) (Miss. Ct. App. 2005)).

*Herron v. Herron*, 338 So. 3d 662, 670-71 (¶24) (Miss. Ct. App. 2022). While the record is silent on when the properties were acquired, the record does confirm that Christopher owned numerous rental properties and had substantial equity in his investment properties while he was still married to Christa. He identified seven rental properties on the 2019 joint tax return he filed with Christa. In his Rule 8.05 financial statement, he reported that he had $100,000 in equity in a house located at 5094 West 4th Street, Hattiesburg, Mississippi; $10,000 in equity in a house located at 2920 Marwood Drive, Jackson, Mississippi; $27,000 in equity in a house located at 27 Cottage View, Ellisville, Mississippi; and $22,000 in equity in a house located at 1001 South Main Street, New Augusta, Mississippi.

¶46. Additionally, the record reveals that Christopher and Christa owned one property together, which they agreed would be part of the real estate business. They initially rented the property and earned a net income of $400 a month. They later sold the property for $18,000 profit and split the proceeds. "[W]hen determining whether certain property is marital, a chancery court 'must inquire whether any income or appreciation resulted from *either spouse's active efforts* during the marriage.'" *Pettersen v. Pettersen*, 269 So. 3d 466, 473 (¶18) (Miss. Ct. App. 2018) (emphasis added) (quoting *Rhodes v. Rhodes*, 52 So. 3d 430, 436 (¶20) (Miss. Ct. App. 2011)). "If so, that income or appreciation becomes part of the

marital estate." *Id*. It is clear from the record that this property was part of the real estate business. It was acquired through the "active efforts" of Christopher while he was still married to Christa, and they both received income as a result of Christopher's efforts.

¶47. We must keep in mind that absent sufficient evidence to the contrary, "[t]he law presumes that all property acquired or accumulated during marriage is marital property." *Castle*, 266 So. 3d at 1049 (¶28). Here, Christopher simply failed to meet his burden, and without sufficient evidence to overcome the presumption, the chancery court was obligated to find that the real estate business was marital property. Thus, we reverse and remand this issue to the chancery court to factor in the real estate business and make a new determination on the equitable distribution of marital assets.

### III. Failing to Trace Funds Used to Purchase the Marital Home

¶48. Christa's final assignment of error is that the chancery court's ruling should be reversed and remanded because the court failed to trace proceeds from the sale of Christa's pre-marital home that were used for the purchase of the marital home. We disagree and affirm the chancery court's ruling regarding this matter.

¶49. We will repeat that "the law presumes that all property acquired or accumulated during marriage is marital property." *Id*. "Assets which are classified as non-marital, such as inheritances, may be converted into marital assets if they are commingled with marital property or utilized for domestic purposes, absent an agreement to the contrary." *Stewart v. Stewart*, 864 So. 2d 934, 937 (¶12) (Miss. 2003) (quoting *Boutwell v. Boutwell*, 829 So. 2d 1216, 1221 (¶20) (Miss. 2002)). "Separate property that has been 'commingled with the joint

23

marital estate' also becomes marital property subject to equitable distribution." *Id*. (quoting *Johnson*, 650 So. 2d at 1286).

¶50. Our Courts have previously held that separate funds used to invest in a marital home were commingled. *E.g.*, *Henderson v. Henderson*, 703 So. 2d 262, 265 (Miss. 1997); *see also Castle*, 266 So. 3d at 1051 (¶35) (both parties contributed "time and efforts" to the marital home, so separate funds used to build the home lost their separate character); *Singley v. Singley*, 846 So. 2d 1004, 1011-12 (¶¶19-21) (Miss. 2002) (involving $70,000 in premarital inherited funds used for down payment on marital home that was considered to have been "co-mingled and became a part of the marital estate" and reversing the chancellor to adjust the equitable distribution based on the source of the $70,000).

¶51. The record shows that Christa and Christopher both owned homes before their marriage and that the family moved into Christa's home after the marriage.[6] The record does not explain how the couple disposed of Christopher's prior home. The couple purchased the Madison Place home after they married and then moved the family into the residence. The Madison Place home was indisputably used for familial purposes. The record also is clear that the proceeds from the sale of Christa's former home were used for both a down payment and renovations. No data in the record indicates how much money was spent in each category. The chancery court found that both parties made substantial contributions to the accumulation of the marital residence and that proceeds from the sale of Christa's separate

---

[6] Since the family lived in Christa's home with the children (as a family) for a time before the purchase of the Madison Place home, it raises the question of whether the proceeds from Christa's home can actually be considered separate property. The chancery court did not make a finding on this matter.

24

home were commingled and converted to marital. Based on the caselaw above, we find no error in the chancery court's determination; thus, we affirm.

## CONCLUSION

¶52. Based on a review of the record and applicable caselaw, we find that the chancery court did not err by granting Christopher a divorce on the ground of habitual cruel and inhuman treatment. We also find no error in the chancery court's decision not to trace the proceeds from Christa's prior residence or in the court's determination that those funds were commingled when applied to the marital residence. However, we find that the chancery court erred in its determination that the real estate business was a separate, non-marital asset due to Christopher's failing to meet his burden of proof. Therefore, the judgment of the chancery court is affirmed in part and reversed in part, and we remand for further proceedings consistent with this opinion.

¶53. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. EMFINGER, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE OPINION.**